**Homer REED, Plaintiff–Appellant,**

v.

**Gordon FAULKNER, et al.,
Defendants–Appellees.**

**No. 87–1632.**

United States Court of Appeals,
Seventh Circuit.

Submitted March 10, 1988.

Decided March 29, 1988.

Homer Reed, pro se.

David L. Steiner, Deputy Atty. Gen., Indianapolis, Ind., for defendants-appellees.

Before CUMMINGS, CUDAHY and POSNER, Circuit Judges.

POSNER, Circuit Judge.

Homer Reed, an inmate in an Indiana state prison, has sued the prison's officials, charging that they infringed his religious liberty and deprived him of the equal protection of the laws by enforcing against him a prison regulation that forbids male inmates to wear their hair so long that it touches the collar. The defendants on one occasion forced Reed to cut several inches off his shoulder-length "dreadlocks" ("long, ropy, matted, woolly strands," Note, *Soul Rebels: The Rastafarians and the Free Exercise Clause,* 72 Geo.L.J. 1605, 1608 (1984)), and on other occasions disciplined him for his refusal to cut his hair. Reed claims that in doing these things the defendants violated his religious liberty as a Rastafarian and discriminated in favor of American Indians, against whom the regulation on hair length is not enforced. The district judge gave judgment for the defendants after a two-day bench trial (at

which Reed did not have assistance of counsel), and Reed, still without counsel, appeals.

The Rastafarians are a religious sect that originated among black people in Jamaica but that has adherents among American blacks as well. Its tenets (well described in the *Georgetown Law Journal* note and confirmed by the record in this case), most of which are derived by interpretation of passages in the Bible, are that Haile Selassie, the deposed emperor of Ethiopia who died in 1975, is God and that Marcus Garvey (the Pan–African leader of Jamaican extraction) is his Prophet; that Ethiopia is heaven, and Jamaica hell; that the Rastafarians are the reincarnation of the ancient Israelites, and are the chosen people; that men should not shave, cut, or comb their hair (hence the "dreadlocks," which apparently are the natural result of letting one's hair grow wild); that black people are superior to white people and are destined eventually to rule the earth; that marijuana is a holy herb; and that meat should not be eaten. This assemblage of beliefs will strike most Americans as bizarre, but then most Americans are not Rastafarians, and religious beliefs often strike the nonbeliever as bizarre. (Ambrose Bierce's aptly named *Devil's Dictionary* defines "impiety" as "your irreverence toward my deity.") The district judge assumed that the Rastafarian faith is a bona fide religion for purposes of the First Amendment, and there is no reason to doubt that this is a proper assumption.

But the judge was inclined to doubt that Homer Reed is a sincere adherent to the faith. There was evidence that Reed had been seen eating meat, that his beard was so short that he must have shaved, and that his hair was so neat that he must have combed it. Apart from the oddity of taking evidence on such matters, one item of evidence is distinctly odd. The prison doctor testified that if Reed had not shaved, his beard would be the same length as his hair; this is a law of nature of which we have never heard and find hard to credit. From all this evidence the judge concluded that "the protestations of religious faith by this plaintiff are less than sincere." The

judge did not stop there but went on to find "the following legitimate reasons" to support the regulation and its enforcement against Reed: "a security concern for the potential use of long hair for concealing and moving contraband; a security concern for potential racial conflict from the professed Rastafarian belief that dreadlock symbolizes black superiority; a safety concern for the potential danger of long uncombed hair getting caught in machinery or cell doors; a public health and sanitation concern arising from the increased risk of infection and lice . . .; and finally, the disciplinary problems that arise from allowing an exception from the hair policy for some inmates and complaints about that exception by others." The judge did not mention the equal protection issue or remark the exception for American Indians.

■ "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley,* —— U.S. ——, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987). This is not a demanding standard, and it implies that if either Reed is not a sincere Rastafarian or the regulation limiting the length of male inmates' hair strikes a reasonable balance between the interest in religious liberty and the needs of prison safety and security, he must lose on his free-exercise claim. See, e.g., *Hadi v. Horn,* 830 F.2d 779, 784 (7th Cir.1987); *Azeez v. Fairman,* 795 F.2d 1296, 1302 (7th Cir.1986); *Brightly v. Wainwright,* 814 F.2d 612 (11th Cir. 1987) (per curiam). And if the exception for American Indians is nonarbitrary he must lose on his equal protection claim as well. This is not because discrimination between religions is deemed on a constitutional par with those purely "economic" discriminations that the equal protection clause, in modern interpretations, treats so leniently, but because the religious dimension of the discrimination is governed by the religion clauses of the First Amendment, leaving for the equal protection clause only a claim of arbitrariness unrelated to the character of the activity allegedly discriminated against.

In concluding that Reed is insincere, the district judge appears to have attached conclusive weight to Reed's "backsliding"—his eating of meat, and his (inferred) shaving of his beard. Evidence of nonobservance is relevant on the question of sincerity, and is especially important in the prison setting, for an inmate may adopt a religion merely to harass the prison staff with demands to accommodate his new faith. Cf. *Azeez v. Fairman, supra,* 795 F.2d at 1298. That may well have been true of the plaintiff in *Garza v. Miller,* 688 F.2d 480, 483 (7th Cir.1982), who having converted to Judaism complained that there were too few Jewish inmates at Marion Federal Penitentiary to make up a *minyan* (a quorum for prayer, requiring a minimum of ten males above the age of 13); and of the plaintiff in *Childs v. Duckworth,* 705 F.2d 915 (7th Cir.1983), who complained that he had not been permitted to start a satanic church in his prison. But the fact that a person does not adhere steadfastly to every tenet of his faith does not mark him as insincere. Some religions place unrealistic demands on their adherents; others cater especially to the weak of will. It would be bizarre for prisons to undertake in effect to promote strict orthodoxy, by forfeiting the religious rights of any inmate observed backsliding, thus placing guards and fellow inmates in the role of religious police. See *Teterud v. Burns,* 522 F.2d 357, 360 (8th Cir.1975). We cannot determine from Judge Sharp's opinion whether he thought Reed's backsliding merely evidence of insincerity, which would be proper, or whether he thought it conclusive evidence of insincerity, which would be improper. A further point is that in the case of a church that unlike the Roman Catholic Church or the Church of England is not hierarchical—and the Rastafarian church or sect is not hierarchical—who is to say at what precise point orthodoxy becomes apostasy?

The regulation on hair length is plausibly supported by considerations of safety and security; a mundane but important point is that requiring prisoners to wear their hair short makes it harder for them to change their appearance, should they escape, by cutting their hair short. Similar regulations have been upheld by other courts against religious claims similar to Reed's. See *Brightly v. Wainwright, supra; Hill v. Blackwell,* 774 F.2d 338 (8th Cir.1985); *Wilson v. Schillinger,* 761 F.2d 921, 924–29 (3d Cir.1985); *Dreibelbis v. Marks,* 742 F.2d 792 (3d Cir.1984). It seems to have been common ground among the Justices in *Goldman v. Weinberger,* 475 U.S. 503, 106 S.Ct. 1310, 89 L.Ed.2d 478 (1986), that the military can ban dreadlocks, but of course the conditions of military and prison life are, fortunately, not identical. And the other cases (except *Brightly,* which states no reasons for its conclusion) rest on findings of fact that demonstrate the reasonableness of enforcing a particular regulation on hair length against particular religious claimants.

Whatever the ultimate merits of Reed's challenge, which may well be slight, the district judge's findings raise two serious problems. One concerns the finding about the danger of racial conflict posed by the Rastafarian belief that blacks are superior to whites. No evidence of such a danger was presented, and in any event it is not easy to see how forcing Rastafarians to cut their hair is going to change this belief. One prison administrator testified "that a person who is wearing the symbol of the dreadlock might indeed be wearing something as a symbol" that blacks are superior to whites, and apparently it was this testimony that became transmogrified in the district court's opinion into "a security concern for potential racial conflict from the professed Rastafarian belief that dreadlock symbolizes black superiority." Actually there was no evidence that the dreadlock symbolizes black superiority, as distinct from being a conspicuous outward manifestation of Rastafarianism, a faith that does teach black superiority; however, as such a manifestation it might remind white inmates of the Rastafarian belief in black superiority. Yet this is pure conjecture, and to suppose that the wearing of dreadlocks would lead to racial violence is, on this record, the piling of conjecture upon conjecture. The potential infringement of

the free-speech clause of the First Amendment is too plain to warrant comment. See *McCabe v. Arave*, 827 F.2d 634, 638 (9th Cir.1987), and cases cited there. Whether the other grounds are sufficient to uphold the regulation is a matter to be decided by the district judge in the first instance.

The other problem has to do with the American Indians and relates to Reed's equal protection claim as well as to his free-exercise claim. The defendants admit that they do not enforce the regulation on hair length against Indians. The only reason they give is that the district judge had ordered them in another case (apparently not reported) to allow Indians to wear their hair long. At this point in the trial the judge interjected: "I didn't write an opinion. It was done in this very room. I tell you that right now. I can remember it vividly. It is not a subject of a written opinion. You won't find it. It was done orally. Get on. I am just educating you a little bit. I will educate you some more before it is over." The subject of Indians was then dropped.

If the safety, security, sanitation, and other reasons advanced in support of the regulation were deemed overridden by the claims of American Indians (whatever those claims are), it is not obvious why Rastafarians should be forced to comply with the regulation. The only obvious distinction, but also the weakest part of the defendants' argument in support of the regulation, is that the Rastafarians preach black superiority; but maybe the Indians preach Indian superiority, in which event it may be a distinction without a difference. (This assumes that American Indians have been exempted from the regulation on religious grounds; actually there is no clue in the record as to the nature or grounds of the exemption.) Now it may be that Indians do not wear their hair as long as Rastafarians do, or are more peaceable inmates, do not preach racial superiority, etc., but none of these things was brought out at trial and neither the briefs nor the district court's opinion suggest any relevant differences between Rastafarians and Indians— suggest any differences, period, except that the latter are the beneficiaries of an unreported order by the same district judge.

We reject the defendants' argument that it was Reed's burden to show that there is no relevant difference between Rastafarians and Indians. Having shown an apparent pattern of arbitrary enforcement of the regulation, Reed shifted to the defendants the burden of producing some evidence from which it might be inferred that the pattern was not arbitrary. Cf. *Native American Council of Tribes v. Solem*, 691 F.2d 382, 384 (8th Cir.1982). The defendants might have argued that they disagree with Judge Sharp's order exempting Indians from the regulation, that they didn't think the matter worth appealing, but that they are not obliged, on penalty of being held to violate the equal protection clause otherwise, to comply with the spirit as well as letter of the order by extending its protections to Rastafarians. This might well be a good argument, but the defendants do not make it. Nor do they argue, as they could on the basis of *Wilson v. Schillinger, supra*, 761 F.2d at 928–29, that the existence of Judge Sharp's order, whatever its basis, makes it impossible to regard their discrimination against Rastafarians as intentional within the meaning given this word in equal protection cases. So far as we can tell in the absence of any discussion of the issue in the judge's opinion, the defendants are treating the Rastafarians differently from American Indians (and doing so deliberately) for no reason at all; and if so this is a denial of equal protection of the laws in an elementary sense.

The judgment of the district court is vacated and the case remanded for further consideration (which may include the taking of additional evidence if Judge Sharp thinks that that would be useful) in light of this opinion. Circuit Rule 36 shall not apply on remand.

VACATED AND REMANDED.