In the

# United States Court of Appeals

### For the Seventh Circuit

No. 10-3256

OMAR GRAYSON,

*Plaintiff-Appellant*,

*v.*

HAROLD SCHULER,

*Defendant-Appellee*.

Appeal from the United States District Court
for the Southern District of Illinois.
No. 3:09-cv-00335-MJR—**Michael J. Reagan**, *Judge*.

SUBMITTED NOVEMBER 22, 2011—DECIDED JANUARY 13, 2012

Before POSNER, ROVNER, and HAMILTON, *Circuit Judges*.

POSNER, *Circuit Judge*. The plaintiff, a former inmate of the Big Muddy Correctional Center, an Illinois prison, brought this suit under 42 U.S.C. § 1983 against a correctional officer who ordered the forcible shearing of the plaintiff's dreadlocks. The plaintiff argues that the order (which was carried out) violated the free exercise clause of the First Amendment. The district judge granted the defendant's motion for summary judgment and dismissed the case.

Inmates' complaints that prison authorities have infringed their religious rights commonly include a claim under the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. §§ 2000cc *et seq.*, which confers greater religious rights on prisoners than the free exercise clause has been interpreted to do. See 42 U.S.C. § 2000cc-1; *Cutter v. Wilkinson*, 544 U.S. 709, 714-17 (2005). The plaintiff doesn't mention the Act, but he is proceeding pro se and in such cases we interpret the free exercise claim to include the statutory claim. *Ortiz v. Downey*, 561 F.3d 664, 670 (7th Cir. 2009). But the Act can no longer do him any good. Although his complaint is none too clear, he appears to be seeking damages against the defendant in both the latter's official capacity and his personal capacity, and the former claim is barred by the state's sovereign immunity, *Sossamon v. Texas*, 131 S. Ct. 1651, 1658-61 (2011); *Vinning-El v. Evans*, 657 F.3d 591, 592 (7th Cir. 2011), and the latter claim cannot be based on the Act because the Act does not create a cause of action against state employees in their personal capacity. *Nelson v. Miller*, 570 F.3d 868, 886-89 (7th Cir. 2009). It does authorize injunctive relief, which the plaintiff initially sought along with damages, but he's since been released from prison, so his injunctive claim is moot and he is left with his personal-capacity damages claim under section 1983.

Illinois prison inmates are allowed to "have any length of hair" they want, provided, so far as bears on this case, that it "do[es] not create a security risk." 20 Ill. Admin. Code 502.110(a). The defendant ordered the plaintiff's dreadlocks cut off on the ground that they posed a security

risk, though he did not explain why. The plaintiff complained to the prison chaplain, who informed him that only inmates who are Rastafarians are permitted to wear dreadlocks. The plaintiff is not a Rastafarian, but a member of the African Hebrew Israelites of Jerusalem; and according to the chaplain the members of that sect are not required by their faith to wear dreadlocks (this appears to be correct), and therefore, he concluded, the plaintiff was not entitled to wear them. (It's the "therefore" that's the issue in this appeal.) The plaintiff filed an internal prison grievance, but it was denied on the basis of the chaplain's theological opinion.

Dreadlocks can attain a formidable length and density, as shown in this photograph of the late Jamaican musician Bob Marley (a Rastafarian):



One can see why prison officials might fear that a shank or other contraband could be concealed in an inmate's dreadlocks, or why they might want inmates to wear their hair short because inmates with long hair can more easily change their appearance, should they escape, by cutting their hair. Short hair is also more hygienic than very long, braided hair. The case law indicates that a ban on long hair, including dreadlocks, even when motivated by sincere religious belief, would pass constitutional muster. See *Fegans v. Norris*, 537 F.3d 897, 906 (8th Cir. 2008); *Henderson v. Terhune*, 379 F.3d 709, 712-15 (9th Cir. 2004); *Harris v. Chapman*, 97 F.3d 499, 503-04 (11th Cir. 1996); *Hamilton v. Schriro*, 74 F.3d 1545, 1551 (8th Cir. 1996); see also *Reed v. Faulkner*, 842 F.2d 960, 963 (7th Cir. 1988); cf. *Green v. Polunsky*, 229 F.3d 486, 489-90 (5th Cir. 2000).

Regulations of general applicability, not intended to discriminate against a religion or a particular religious sect, were held in *Employment Division v. Smith*, 494 U.S. 872 (1990), not to violate the free exercise clause. Its holding should apply to prison inmates along with everyone else—as indeed assumed in *Cutter v. Wilkinson*, *supra*, 544 U.S. at 714-17—and therefore authorize any ban on long hair as long as it is not motivated by religious prejudices or opinions. But the applicability of *Smith* to prisoners is uncertain because of an earlier Supreme Court decision, *O'Lone v. Shabazz*, 482 U.S. 342, 348-50 (1987), not expressly overruled by *Smith* or *Cutter*, which requires prison authorities to "accommodate" an inmate's religious preferences if consistent with security and other legitimate penological concerns. See also *Turner v. Safley*,

482 U.S. 78 (1987). Accommodation is what *Smith* says the free exercise clause does *not* require; and it's hard to believe that prisoners have more rights than nonprisoners. But we're not supposed to declare a decision by the Supreme Court overruled unless the Court makes clear that the case *has* been overruled, even if we're confident that the Court would overrule it if the occasion presented itself. *State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997); see *Vinning-El v. Evans*, *supra*, 657 F.3d at 592-93; *Sasnett v. Litscher*, 197 F.3d 290, 292 (7th Cir. 1999). No matter. This as we'll see is a case of outright arbitrary discrimination rather than of a failure merely to "accommodate" religious rights.

Prison officials might sometimes actually want on security grounds to exempt from a ban on long hair inmates whose motivation was religious, cf. *Cutter v. Wilkinson*, *supra*, 544 U.S. at 724-25; accommodating a genuine religious observance might reduce rather than increase the risk of prisoner misconduct. At the same time the prison officials might want to distinguish between religiously motivated practices that are required by the prisoner's religion and those that are optional, a distinction we discuss below. But nowhere in the record can we find this or any other articulated ground for the prison's Rastafarian exception to a ban on long hair. Nor could such a ground be easily squared with the language of the Illinois statute that we quoted. Permitting prisoners to "have any length of hair . . . so long as" it "do[es] not create a security risk" doesn't sound like "prisoners must have short hair unless they are Rastafarians." The defendant suggests that the prison

could ban all prisoners from wearing dreadlocks but does not argue that that's the prison's policy; he tacitly accepts the Rastafarian exception announced to the plaintiff by the prison chaplain.

The prison would be hard pressed to defend a rule that *only* Rastafarians may wear dreadlocks (though for all we know that *is* the prison's rule, or at least its de facto rule, declared by the chaplain), unless it were certain that no other sect, and not even any individual prisoner's private faith, considers wearing dreadlocks a religious observance; barring such an exception, such a rule would discriminate impermissibly in favor of one religious sect. *Cruz v. Beto*, 405 U.S. 319, 322 (1972) (per curiam); *Vinning-El v. Evans, supra*, 657 F.3d at 595.

We can imagine religious discriminations that could be justified by security concerns: a ban on Thuggee, the notorious Indian cult stamped out by the British whose votaries believed they were the children of the Hindu goddess Kali (created from her sweat) and that she had commanded them to commit mass murder—a command they followed with enthusiasm. But the Big Muddy Correctional Center allows Rastafarians to wear dreadlocks and has failed to give a reason for thinking that the plaintiff but not they would be a security risk if allowed to wear them.

Nor could the prison permit only members of sects (even if not limited to Rastafarians) that "officially" require the wearing of dreadlocks to wear them. Heretics have religious rights. *Frazee v. Illinois Dep't of Employment Security*, 489 U.S. 829, 834 (1989); *United States v. Ballard*,

322 U.S. 78, 86-87 (1944); *Ortiz v. Downey*, *supra*, 561 F.3d at 669. The founders of Christianity (Jesus Christ, the Apostles, and St. Paul) were Jewish heretics; Luther and Calvin and the other founders of Protestantism were Catholic heretics. Religious belief must be sincere to be protected by the First Amendment, but it does not have to be orthodox. And anyway the plaintiff is not a heretic; there is no suggestion that orthodox African Hebrew Israelites of Jerusalem think it wrong to take and abide by the Nazirite vow, the basis of the plaintiff's claim that wearing dreadlocks is for him a religious observance, though dreadlocks do not have the symbolic significance for African Hebrew Israelites of Jerusalem that they do for Rastafarians.

Since heresy is not excluded from the protection of the free exercise clause, optional as distinct from mandatory religious observances aren't excluded either. Which brings us to the plaintiff and his vow. Believing as they do that the original Jews—the Jews of the Old Testament—were black and that black people today are the descendants of those Jews, African Hebrew Israelites of Jerusalem venerate the Old Testament. *African Hebrew Israelites of Jerusalem*, "Our Philosophy," www.africanhebrewisraelitesofjerusalem.com/Our_Philosophy.htm (visited Dec. 16, 2011). And in Numbers 6:2-5 God is reported as saying to Moses (in the King James translation): "Speak unto the children of Israel, and say unto them, When either man or woman shall separate themselves to vow a vow of a Nazirite, to separate themselves unto the LORD, . . . all the days of his separation there shall no razor come upon his head . . . . [He] shall let the locks of the hair of his head grow long." The

word "Nazirite" (or "Nazarite") is from the Hebrew *nazir*, meaning "set apart," and the Old Testament states in several places besides Numbers that Nazirites must not cut their hair. The most celebrated statement is in the Book of Judges and concerns Samson, who recklessly explains to Delilah that if his hair were shorn, his strength would go with it. Judges 13:5, 16:17. Samson had seven braids, Judges 16:19, which could well have been dreadlocks.

The plaintiff told the defendant that he was taking "the Nazarite vow of separation," and while the vow does not appear to require dreadlocks, which are not the only form that uncut hair can take, the parties agree that "due to his African ancestry, Plaintiff's hair naturally forms into dreadlocks when it grows long." African Hebrew Israelites of Jerusalem might well deem taking the Nazirite vow an appropriate supplemental observance, cf. *Swift v. Lewis*, 901 F.2d 730, 731 (9th Cir. 1990), and a religious believer who does more than he is strictly required to do is nevertheless exercising his religion. A Catholic who vows to obey the Rule of St. Benedict and therefore avoid "the meat of four-footed animals" is performing a religious observance even though not a mandatory one. *Nelson v. Miller*, *supra*; see also *Employment Division v. Smith*, *supra*, 494 U.S. at 886-87; *Ortiz v. Downey*, *supra*, 561 F.3d at 669; *Teterud v. Burns*, 522 F.2d 357, 360 (8th Cir. 1975).

True, there is more to the Nazirite vow than just not cutting one's hair, such as not eating or drinking any grape product or going near dead bodies, Numbers 6:4-6,

and perhaps someone who took the vow and let his hair grow but ignored the other proscriptions could be thought insincere—though we repeat our warning in *Reed v. Faulkner*, *supra*, 842 F.2d at 963, that a sincere religious believer doesn't forfeit his religious rights merely because he is not scrupulous in his observance; for where would religion be without its backsliders, penitents, and prodigal sons? On this record there is no basis for doubting that the plaintiff's taking the Nazirite vow was religiously motivated.

Prison authorities are always entitled to balance security concerns against religious practices, and the need to do so may be greater with regard to optional than to mandatory practices. In *Koger v. Bryan*, 523 F.3d 789, 794 (7th Cir. 2008), the inmate was an adherent of Thelema, a spiritual philosophy (a religion in the broad sense in which the term is used in First Amendment cases) that "has as its central tenet 'Do what thou wilt.'" Thelema's single mandatory tenet invites an infinity of optional observances. And in *New Rider v. Board of Education of Independent School Dist. No. 1*, 480 F.2d 693, 696 (10th Cir. 1973), we learn that the Pawnee Indians believe "that everything the Pawnee does each day *has religious significance*" (emphasis in original). Inmates can drive their keepers crazy by multiplying observances, as when Muslim prisoners refuse to step forward at roll call, precipitating a futile search (futile because they are present) because, without telling the prison authorities, they have adopted a Muslim name, *Azeez v. Fairman*, 795 F.2d 1296, 1298-99 (7th Cir. 1986), which Islam encourages but does not require.

But there is no suggestion that allowing this plaintiff to have grown dreadlocks would have created a wildfire of idiosyncratic observances, and so we are left with what appears to be discrimination (though a trial might cast the facts in a different light). Prison chaplains may not determine which religious observances are permissible because orthodox. *Vinning-El v. Evans*, *supra*, 657 F.3d at 595. We held in *Reed v. Faulkner*, *supra*, 842 F.2d at 964, that a prison could not forbid Rastafarians to wear long hair while permitting American Indians to do so. No more can the prison permit Rastafarians to wear long hair and without justification forbid a sincere African Hebrew Israelite of Jerusalem to do so, even if he is more zealous in his religious observances than his religion requires him to be.

Since, however, "[qualified] immunity protects public employees who make reasonable errors in applying even clearly established law," *Vinning-El v. Evans*, *supra*, 657 F.3d at 594, the defendant is entitled to immunity if he committed a reasonable error in failing to apply clearly established law—that is, if he reasonably thought the plaintiff insincere in his religious belief, or a security threat. But there is no suggestion that the defendant ordered the plaintiff's dreadlocks shorn because of a reasonable belief in either of these possibilities. He seems just to have been applying the Rastafarian exception, which could not reasonably be thought constitutional.

So neither on substantive nor immunity grounds can the grant of summary judgment be upheld. The judg-

ment is reversed and the case remanded for further proceedings consistent with this opinion.

REVERSED AND REMANDED.