In the

# United States Court of Appeals

### For the Seventh Circuit

No. 11-3297

PETER A. LEWIS,

*Plaintiff-Appellant,*

*v.*

JERRY L. STERNES, *et al.*,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Western Division.
No. 04 C 50160—**Frederick J. Kapala**, *Judge.*

SUBMITTED FEBRUARY 14, 2013—DECIDED MARCH 28, 2013

Before POSNER, WOOD, and TINDER, *Circuit Judges.*

POSNER, *Circuit Judge.* The plaintiff is an inmate of the Dixon Correctional Center, an Illinois prison. He brought this suit under 42 U.S.C. § 1983 against prison officials who he claims both violated his religious rights under the Constitution and denied him equal protection of the laws, but also under the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. §§ 2000cc *et seq.* (and a parallel state law, which we need

not discuss), complaining that those same officials denied him an accommodation, to which he says the Act entitled him, of his religious observances. He appeals from the grant of summary judgment in favor of the defendants.

The plaintiff is a member of a religious sect called the African Hebrew Israelites of Jerusalem, and consistently with the creed of that sect he took the Nazirite vow, which among other things committed him not to cut his hair. As a result he wore his hair in dreadlocks, which form naturally in some people who do not cut their hair. About the sect and its creed and how compliance with the Nazirite vow by an African Hebrew Israelite of Jerusalem can result in the votary's hair forming dreadlocks see *Grayson v. Schuler*, 666 F.3d 450 (7th Cir. 2012).

The present suit is a sequel to an earlier one, in which the plaintiff had claimed that the defendants had infringed his religious freedom by refusing to allow him to have visitors unless he consented to have his hair cut. That suit was settled in 2003; the parties agreed that the plaintiff could receive visitors, consistent however with the rules and regulations of the Illinois Department of Corrections, if he allowed prison staff to search his hair before and after any visit lest he be concealing contraband in his dreadlocks.

The settlement turned out to do nothing for the plaintiff. Although Illinois prison inmates are allowed to "have any length of hair" they want—provided, so far as bears on this case, that their hairstyle "do[es] not create a security

risk," 20 Ill. Admin. Code § 502.110(a)—the prisons have, consistent with that proviso, adopted grooming policies that require haircuts for any inmate whose hairstyle creates a security risk, including hairstyles that prevent searching hair effectively for contraband. We do not interpret the settlement as making an exception for our plaintiff.

Neither side suggests combing out the plaintiff's hair without cutting, so that though long (because uncut) the hair would be readily searchable because it would not have the thickness or density of dreadlocks. It is widely believed that dreadlocks can be removed only by cutting, and that is the most common method by far. But with the aid of a conditioner and a degreasing shampoo they can be combed out without any cutting, although it takes many hours. E.g., Dreadlocks.Org,, "How to Remove Dreadlocks," Oct. 31, 2005, www.dreadlocks.org/how-to-remove-dreadlocks/ (visited March 15, 2013). We do not know whether the method is feasible in a prison setting; and if it is, yet it might take too much time to have enabled the plaintiff to appear in court on schedule (a critical event in this case, as we're about to see) without dreadlocks.

In January 2004, when the plaintiff was scheduled to appear in federal court in a case he had filed, the prison gave him a choice: a haircut, or segregation as punishment for eluding, by refusing a haircut, his scheduled trip to court. (Dropping his case apparently was not an option; the court had ordered him to appear.) He chose the haircut. He claims that the court date had been postponed (which is true), that the prison officials knew

this, and that therefore the prison had no reason grounded in security concerns for making him cut his hair. There is dispute over which prison officials knew what and when about the looming court date. But it is undisputed that Lewis was transported to court shortly after his haircut. And it is obvious that transporting prisoners and placing them in courtrooms present significant security concerns, warranting protective measures. In any event, since Lewis's court date had merely been postponed, not canceled, he would have had to choose between the haircut and segregation eventually.

Although his motivation for not wanting to cut his hair is religious, he has no evidence that the prison made him cut his hair because of ignorance of his religion or its observances, as in the *Grayson* case. He complains that his prison's policy on dreadlocks is arbitrary and unjustifiable, and he also seeks an "accommodation"—that is, he wants the prison to make an exception for him from the policy (even if the policy is valid as applied to prisoners who have no religious claim) *because* of his religion.

Whether there is a constitutional as distinct from a statutory right to a religious accommodation is an open question, though one unnecessary to try to resolve in this case. It is open because of the tension, discussed both in *Grayson v. Schuler, supra*, 666 F.3d at 452-53, and in *Vinning-El v. Evans*, 657 F.3d 591, 592-93 (7th Cir. 2011), between, on the one hand, the Supreme Court's decisions in *O'Lone v. Shabazz*, 482 U.S. 342, 348-50 (1987), and *Turner v. Safley*, 482 U.S. 78 (1987), which create a First Amend-

ment duty of religious accommodation in prisons, and on the other hand *Employment Division v. Smith*, 494 U.S. 872 (1990), which denies a constitutional duty of religious accommodation in broad terms yet without overruling *O'Lone* or *Turner*. RLUIPA, however, unquestionably creates a statutory right of accommodation. See 42 U.S.C. § 2000cc-1; *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 335-36 (5th Cir. 2009).

We said that the plaintiff is both seeking an exception, premised on his religion, from a rule of general applicability, which is an accommodation claim, and complaining that the rule is arbitrary. To forbid a person to engage in a sincere religious observance without a defensible reason is a violation of the free-exercise clause that is distinct from a refusal to bend a valid rule of general applicability in recognition that it interferes with a religious observance. One might think that, given RLUIPA, no one would bother to argue for the denial of his constitutional right to the free exercise of religion. For it is easier to prove that a defendant failed or is failing to accommodate a valid rule to a religious need, a determination that balances the defendant's need to apply the rule to the plaintiff against the plaintiff's interest in religious freedom, than to prove that the rule is invalid across the board. But because of differences in the remedies and procedures applicable to a RLUIPA case from those applicable to suits under 42 U.S.C. § 1983, a plaintiff will sometimes find it advantageous to proceed under section 1983 rather than, or (as in this case) as well as, under RLUIPA.

The plaintiff has presented no evidence, however, either that his prison has no need to regulate hair length or hairstyle (a free-exercise claim) or that the need is not great enough to warrant interference with his religious observance (an accommodation claim). The case law recognizes the need for and validity of rules regulating the hairstyles of prisoners in the interest of security. See, e.g., *Grayson v. Schuler*, *supra*, 666 F.3d at 452, and cases cited there; *Fegans v. Norris*, 537 F.3d 897, 902-03 (8th Cir. 2008); *Longoria v. Dretke*, 507 F.3d 898, 904 (5th Cir. 2007) (per curiam); *Hoevenaar v. Lazaroff*, 422 F.3d 366, 369-72 (6th Cir. 2005); *Hines v. South Carolina Dept. of Corrections*, 148 F.3d 353, 358 (4th Cir. 1998). Although the plaintiff has identified a fellow prisoner who was allowed to wear dreadlocks similar to his, which he argues shows that the prison has no need to regulate dreadlocks, that prisoner was just receiving visitors and not going to court.

We are however troubled by the difference in policies about dreadlocks between the Dixon Correctional Center and the Big Muddy River Correctional Center, the Illinois prison in which the prisoner in the *Grayson* case was incarcerated. Big Muddy had allowed Rastafarians (but not Grayson's sect, which like the plaintiff's in this case was the African Hebrew Israelites of Jerusalem) to wear dreadlocks. It wouldn't have had to do that if the prison officials had thought that dreadlocks created a security risk. For there was no suggestion that Rastafarians are less likely to conceal contraband in their dreadlocks than other dreadlocked prisoners.

Both Dixon and Big Muddy are Illinois medium-security prisons; why would they have different policies about dreadlocks? But there may be a reason. Dixon (our plaintiff's prison) has a more liberal visiting policy than Big Muddy. Prisoners at Big Muddy, if they're not in segregation, may receive visitors from 8:30 a.m. to 5:30 p.m., but are limited to six visits per month and no more than two of the visits are allowed on weekends or holidays. Ill. Dept. of Corrections, "Facilities & Visitation: Big Muddy Correctional Center," www2.illinois.gov/idoc/facilities/pages/bigmuddyriver.aspx (the websites cited in this opinion were visited on Feb. 20, 2013). In contrast, Dixon inmates may receive visitors from 9:00 a.m. to 8:00 p.m., with no monthly, weekend, or holiday limitations. Ill. Dept. of Corrections, "Facilities & Visitation: Dixon Correctional Center," www2.illinois.gov/idoc/facilities/pages/dixoncorrectionalcenter.aspx. Dixon inmates are also, it seems, allowed more time out of their cells—"almost all day," according to one web posting, Illinois Prison Talk, "Dixon Correctional Center," Dec. 13, 2007, www.illinoisprisontalk.org/index.php?topic=7780.100—whereas it seems that inmates at Big Muddy are allowed out of their cells for only about three hours a day. Illinois Prison Talk, "Big Muddy Correctional Center," Sept. 1, 2009, www.illinoisprisontalk.org/index.php?topic=7735.0. Dixon thus seems to be the more "liberal" prison. This may make its staff more concerned than Big Muddy's staff is with the possibility of contraband being brought into or carried out of the prison; and a greater concern would justify tighter controls over hairstyle.

A letter from the plaintiff's lawyer to a lawyer in the Illinois Attorney General's office concerning the plaintiff's previous case states that "I advised [the plaintiff] of your position that the state has no plans to cut his hair and *no regulations that require a certain grooming*" (emphasis added). This letter was sent *before* the suit was settled, however, and is misleading given the directive we described earlier. The letter also states that "Mr. Lewis will not tie his hair up so that there is no way that it can be searched." That is, Lewis would not make searching his hair even more difficult by bundling it at the top of his head rather than letting the dreadlocks dangle loose. But even unbundled his dreadlocks might be difficult to search.

The district judge quoted a district court opinion which says that guards may be too busy to search inmates' hair or may cut their hands on sharp objects concealed in the hair and for these and other reasons shouldn't be required to allow inmates to wear dreadlocks. But these are not concerns voiced by the defendants in the present case. The prison neither has nor defends a general ban against dreadlocks. But we give considerable weight to the defendants' uncontradicted testimony that the thickness and density of the plaintiff's dreadlocks made them difficult to search. This triggers the grooming policy that requires removal of deadlocks in particular cases. An ad hoc policy of this sort invites unequal treatment but the alternative of a flat ban on dreadlocks would curtail prisoners' religious liberty more. Prisons are allowed, as we pointed out in *Grayson*, a broad discretion in matters of security. And that dis-

cretion extends to a determination that a particular inmate's dreadlocks on a particular occasion (such as a visit to federal court) are too thick or dense to be readily searchable. The plaintiff has presented no evidence that he was treated differently from any other inmate similarly situated—an inmate with dreadlocks and a court date. Nor that the prison's security concerns are outweighed in his case by his interest in being permitted to engage in a sincere religious observance. E.g., *May v. Baldwin*, 109 F.3d 557, 562-65 (9th Cir. 1997); *Ragland v. Angelone*, 420 F. Supp. 2d 507, 515-16 (W.D. Va. 2006). As we explained in *Grayson*, the Nazirite vow is an optional rather than mandatory observance for African Hebrew Israelites of Jerusalem. And there is no evidence that a member of that sect is less likely to conceal contraband in his dreadlocks that prisoners who wear dreadlocks for secular rather than religious reasons.

Lewis makes some other claims but we do not discuss them because they are adequately discussed and properly rejected in the district court's opinion.

AFFIRMED.