**NONPRECEDENTIAL DISPOSITION**

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Submitted February 13, 2017[*]
Decided February 13, 2017

**Before**

FRANK H. EASTERBROOK, *Circuit Judge*

ANN CLAIRE WILLIAMS, *Circuit Judge*

DIANE S. SYKES, *Circuit Judge*

No. 16-2279

| | |
|---|---|
| RUFUS WEST, a/k/a MUSLIM MANSA LUTALO IYAPO, *Plaintiff-Appellant*, | Appeal from the United States District Court for the Eastern District of Wisconsin. |
| *v.* | No. 14-CV-1146-JPS |
| DUSTIN KINGSLAND, *Defendant-Appellee*. | J.P. Stadtmueller, *Judge*. |

**O R D E R**

Wisconsin prisoner Rufus West claims in this action under 42 U.S.C. § 1983 that guard Dustin Kingsland treated him harshly because he is Muslim and had lodged numerous grievances, thus violating the First Amendment and his right to equal protection. The district court granted summary judgment for Kingsland, and West

---

[*] We have agreed to decide the case without oral argument because the briefs and record adequately present the facts and legal arguments, and oral argument would not significantly aid the court. *See* FED. R. CIV. P. 34(a)(2)(C).

appeals. We agree with the district court that, on this record, a reasonable jury could not find for West on his constitutional claims.

Except as noted, the following account is undisputed. West, a frequent litigant, is a follower of Islam and in 2013 fasted during Ramadan from July 9 to August 7. At the time he was housed in Unit 9 at Columbia Correctional Institution. Inmates assigned to that unit are confined to their cells except at mealtimes or when scheduled for work, showers, or recreation in the dayroom or yard. Inmates sign up for these activities during each meal. Those not eating (including for religious reasons) are allowed out of their cells during meals but only long enough to sign up for activities. Sergeants, the rank held by Kingsland, had discretion to keep disruptive or noncompliant inmates locked up if they were not eating. In that event, the inmate would ask a staff member to sign him up for activities.

According to West, on Sunday, July 14, Kingsland refused to let him out of his cell at breakfast to sign up for activities. Later that day, West continues, he told Kingsland that just because he was fasting did not mean he should have to stay in his cell during breakfast, prompting Kingsland to reply, "Tell it to the preacher." At that point, West says, he announced he would be filing a grievance, and Kingsland replied, "Just make sure you spell my name right." Kingsland swears that none of West's story is true, and that he *did* release West during breakfast on the 14th, but he loitered and socialized instead of signing up for activities.

Kingsland does not dispute, however, that during the remaining weekends in Ramadan (six occasions total) he did not release West at breakfast, thus limiting his time in the dayroom and ability to shower. One time, says West, he again told Kingsland that he could be released from his cell during breakfast even while fasting, and Kingsland replied: "I'm not a religious person. That's not my problem!" On another occasion, West adds, he requested more grievance forms, and when Kingsland asked if he intended to complain about him "again," he replied, "Absolutely." Kingsland then handed him a stack of grievance forms.

Then on August 3, while West was at the law library, Kingsland (acting alone) searched his cell. The amount of property allowed in a cell is limited, and guards are authorized to search cells at any time but must do so at least monthly. Kingsland typically searches when inmates are away at activities. On the 3rd, Kingsland maintains, West's cell contained more property than allowed. West, who wasn't present, insists that Kingsland ransacked his cell and "stole" a variety of items including an address book, clothing, Ramadan food, pictures and documents taped on

the walls, and even his comb. Although Kingsland denies "taking" West's property, the sergeant who came on duty after Kingsland corroborated West's assertion that Kingsland had removed items from his cell. Regardless, the amount of property in West's cell after Kingsland's search still exceeded the limit, but rather than write a disciplinary report, Kingsland gave him two days to comply with the property policy.

Two days later Kingsland instructed a subordinate to search West's cell. Afterward that guard reported that West still was over the property limit, and Kingsland submitted a conduct report accusing West of disrespecting staff, disobeying orders, and stealing unspecified property. The report's narrative explains that, when the guard arrived to conduct the search, West proclaimed, "I wish these mother fucking pigs would leave me the fuck alone." A lieutenant directed that West be moved to administrative segregation pending his disciplinary hearing, at which the hearing officer found him guilty of disrespecting staff and disobeying orders but not theft. As punishment West was given "10 days cell confinement," but his deadline to dispose of his excess property was extended to 30 days. The warden upheld that decision.

Soon after, Kingsland obtained his supervisor's approval to move West to another housing unit. Kingsland was authorized to recommend reassignments for a variety of reasons, including conflicts with staff. He first chose Unit 1, but West was turned away after arriving with all of his property. Kingsland then sent him to Unit 8, where he had the same privileges he did on Unit 9.

West lodged nine grievances against Kingsland concerning these events. Seven were rejected outright (six as untimely). One of the others was dismissed on the ground that the Unit 9 manager already knew about Kingsland's complaint and had addressed the situation appropriately. And the remaining grievance—the last of the nine—focused, not on Kingsland, but on the alleged procedural errors committed at West's disciplinary hearing. Kingsland avers that he did not know about any of the grievances until after West sued.

At summary judgment West theorized that Kingsland kept him confined at breakfast during the weekends of his Ramadan fast because he is Muslim and to retaliate for his grievances. He also theorized that the initial cell search on August 3 (and the resulting consequences) along with his reassignment to Unit 8 were punishment for those grievances. Kingsland averred, however, that West's behavior at breakfast on July 14 prompted him to keep West in his cell on the six later occasions (all weekend days, though Kingsland did not ascribe significance to that fact). Kingsland also averred—and West did not offer evidence to the contrary—that other fasting

Muslims were allowed out of their cells at breakfast to sign up for activities, while non-Muslim inmates who were not accepting meals but were misbehaving remained in their cells during mealtimes.

In ruling for Kingsland, the district court reasoned that West's accusation of a religious motive for the guard's actions was wholly speculative, and that West lacked admissible evidence from which a jury reasonably could find that he was treated less favorably than similarly situated inmates who are not Muslim. The court reasoned further that, although West had engaged in protected speech by submitting grievances, he lacked evidence that Kingsland's reactions likely would deter protected speech or even that his grievances had been a motivating factor for Kingsland's actions.

On appeal West first challenges the district court's conclusion that he lacks sufficient evidence to establish that Kingsland relied on religion as a reason to keep him confined at breakfast time during Ramadan weekends. Prisoners' claims of religious discrimination typically fit within the framework of the First Amendment or the Religious Land Use and Institutionalized Persons Act, *see, e.g., Cutter v. Wilkinson,* 544 U.S. 709, 712–13 (2005); *Grayson v. Schuler*, 666 F.3d 450, 451 (7th Cir. 2012); *Nelson v. Miller*, 570 F.3d 868, 871 (7th Cir. 2009), making resort to the Equal Protection Clause redundant, *see Sherbert v. Verner*, 374 U.S. 398, 410 (1963); *Reed v. Faulkner*, 842 F.2d 960, 962 (7th Cir. 1988). But this does not mean that West was precluded from arguing that he was denied equal protection. *See City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976); *Higgason v. Farley*, 83 F.3d 807, 810 (7th Cir. 1996). To avoid summary judgment, however, he was subject to a difficult standard: He needed evidence that Kingsland acted with a discriminatory purpose, *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264–65 (1977); *D.S. v. E. Porter Cty. Sch. Corp.*, 799 F.3d 793, 799 (7th Cir. 2015), meaning that Kingsland's actions were motivated at least partly by a desire to adversely affect Muslims, *see Nabozny v. Podlesny*, 92 F.3d 446, 453–54 (7th Cir. 1996).

But after de novo review, *see Daniel v. Cook Cty.*, 833 F.3d 728, 731 (7th Cir. 2016), we cannot see any evidence that religion was a motivating factor in Kingsland's actions. For purposes of this appeal we accept West's version that he never misbehaved on July 14, and so that cannot be why Kingsland later kept him locked up during weekend breakfasts. But this does not mean, or even suggest, that religion was a motivating factor. *See Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 279 (1979). Altogether missing from this record is evidence that only—or mostly or even a few—Muslim inmates stayed locked up during Kingsland's shift while all other prisoners who did not eat breakfast enjoyed time out of their cells. At best West repeatedly *accused* Kingsland

of keeping him confined during his Ramadan fast only because of his religion, but he points to nothing in the record substantiating this speculation, which could not forestall summary judgment. *See Boston v. U.S. Steel Corp.*, 816 F.3d 455, 465 (7th Cir. 2016); *Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 389 (7th Cir. 2010).

West also contests the grant of summary judgment for Kingsland on his claim that he was punished for engaging in protected speech. To win on this claim, West would need to show that after engaging in constitutionally protected speech he was subjected to a deprivation that likely would deter future speech, and that the deprivation was at least partially motivated by his protected speech. *Novoselsky v. Brown*, 822 F.3d 342, 354 (7th Cir. 2016); *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009). West engaged in protected activity by submitting prison grievances, *Pearson v. Welborn*, 471 F.3d 732, 740 (7th Cir. 2006); *Hasan v. U.S. Dep't of Labor*, 400 F.3d 1001, 1005 (7th Cir. 2005), but he did not suffer an actionable deprivation when his cell was searched or when he was moved to a different housing unit. By regulation cells at West's prison were searched monthly if not more often, and he did not introduce any evidence suggesting that his cell was targeted more frequently. *See Roney v. Illinois Dep't of Transp.*, 474 F.3d 455, 461 (7th Cir. 2007) (explaining that routine activities are not materially adverse actions suggesting retaliation under Title VII). And in his new housing unit he enjoyed the same privileges as before. *See Nagle v. Vill. of Calumet Park*, 554 F.3d 1106, 1120–21 (7th Cir. 2009) (explaining that plaintiff who is "punished" but experiences no hardship has not shown a materially adverse action under Title VII).

Moreover, even if we accept that West suffered deprivations when Kingsland kept him confined during some breakfasts and discarded a few items of his excess property during the initial cell search, a jury could not find that Kingsland's actions were motivated by his grievances. West would have to show, first, that Kingsland knew about those grievances. *See Morfin v. City of E. Chicago*, 349 F.3d 989, 1005–06 (7th Cir. 2003). West assumes that Kingsland knew about his grievances because twice he had *threatened* to lodge a grievance against Kingsland, who responded sarcastically. But here again West only speculates that Kingsland concluded from their conversations that he had followed through on his threat. And although Kingsland's uncontested statement that he did not know about the grievances is self-serving, it is based on personal knowledge and was admissible evidence at summary judgment. *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 506 (7th Cir. 2004). Finally, even if Kingsland did know that West had submitted the grievances, West offered no evidence tying Kingsland's actions to the protected conduct. Thus, summary judgment also was appropriate on West's First Amendment claim.

AFFIRMED.