Ripple, Circuit Judge, dissenting.
The people of Wisconsin have recognized in their state constitution the importance *601 of ensuring that every Wisconsin schoolchild receives safe and secure transportation to the school chosen by his parents, whether that school be a state-operated school, a secular private school, or a religiously oriented private school.[1] As the Wisconsin Supreme Court has noted, by enacting this state constitutional provision and its implementing legislation,[2] Wisconsin has recognized that "the same consideration of safety and welfare should apply to public and private students alike." Cartwright v. Sharpe , 40 Wis.2d 494, 162 N.W.2d 5, 11 (1968).[3] Wisconsin's choice accords with the Supreme Court's recognition of the important liberty interest of parents to choose the educational environment of their children. See Pierce v. Soc'y of Sisters, 268 U.S. 510, 534-35, 45 S.Ct. 571, 69 L.Ed. 1070 (1925).
In implementing the State's commitment, conscientious government administrators necessarily face practical problems. Limited funding is one of them. The Wisconsin legislature attempted a partial solution to this perennial problem by mandating that each private school is entitled to bus transportation within an established "attendance area"[4] and by also providing that, except in the case of single-sex schools, "[t]he attendance areas of private schools affiliated with the same religious denomination shall not overlap."[5] The statute, however, does not define what it means for a school to be "affiliated" with a denomination. There is no evidence in this record that this affiliation provision is anything other than a good-faith attempt to implement the transportation program in a sensible, fiscally responsible manner. Nevertheless, the provision's ambiguity has caused significant disagreement, resulting in two decisions by the Wisconsin Supreme Court. Before focusing on the present case, therefore, I pause to examine these two cases of the Wisconsin Supreme Court. Both interpreted the statute in the crosslight of Religion Clause concerns and shed considerable light on the path that we ought to follow in the case before us.
In State ex rel. Vanko v. Kahl , 52 Wis.2d 206, 188 N.W.2d 460, 464 (1971), the Supreme Court of Wisconsin focused directly on the language that, on its face, forbids providing transportation services to children of religiously operated private schools "affiliated with the same religious denomination" as another school already receiving transportation in the same attendance area. The statute contained no similar limitation for non-religious private schools, and the Wisconsin court recognized that this difference in treatment placed an additional burden on children attending a religiously affiliated private school-a burden that was not shared by children attending a non-religious private school. The court *602 therefore construed this provision to apply equally to children in both religiously affiliated private schools and non-religiously affiliated schools. Although not invoking squarely the rule that courts should construe a statute to avoid doubts about its constitutionality, the Wisconsin high court frankly recognized that disparity in the treatment of children attending religious schools would create "an apparent constitutional infirmity." Id. The statute's reference to religiously affiliated schools, noted the court, was simply to ensure that schools conducted by religious orders were considered affiliated with a religious group, even if these schools were not legally owned by the sponsoring religion. Id.[6] As construed by the court in Vanko , therefore, the statute forbade overlapping attendance zones only when a private school was "affiliated or operated by a single sponsoring group, whether such school operating agency or corporation is secular or religious." Id ., at 465.
Vanko made clear that all private schools, not just religious private schools, were subject to the overlapping attendance area limitation. It had no occasion to come to grips with just how a school district should determine the "affiliation" of a religious private school with a "sponsoring group." In Holy Trinity Community School, Inc. v. Kahl , 82 Wis.2d 139, 262 N.W.2d 210 (1978), the Wisconsin Supreme Court addressed this question. In that case, a school of the Catholic Archdiocese of Milwaukee, desiring a larger attendance area that would overlap with other diocesan schools, closed and then immediately reopened under new articles of incorporation and bylaws that did not identify it as a Catholic school and that stated that it had no formal religious affiliation. It continued to employ many of the same teachers, to enroll many of the same students, and to lease, for a dollar a year, its building from the Catholic parish in which it was located. It conducted its religious instruction in a "released-time" program. Id. , at 211.
The State Superintendent of Instruction concluded, on these facts, that the school remained affiliated with the Catholic Church and refused to provide transportation. The Wisconsin Supreme Court did not think that the Superintendent's determination was sustainable. Relying principally on the decisions of the United States Supreme Court in New York v. Cathedral Academy , 434 U.S. 125, 98 S.Ct. 340, 54 L.Ed.2d 346 (1977), Levitt v. Committee for Public Education & Religious Liberty , 413 U.S. 472, 93 S.Ct. 2814, 37 L.Ed.2d 736 (1973), and Lemon v. Kurtzman , 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), the court held that the Superintendent should not make such a detailed inquiry into the school's religious practices to determine whether it was affiliated with another religious body. In the court's view, such an inquiry would have the primary effect of aiding religion or would result in an excessive entanglement of the government in religious affairs. The Superintendent must accept, said the court, the facial validity of the charter and bylaws of the school. Id. , at 216.[7]
*603 In Vanko and Holy Trinity, the Wisconsin Supreme Court adopted the salutary practice of employing "neutral principles of law," Jones v. Wolf, 443 U.S. 595, 600, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979), in order to avoid slipping into the constitutionally impermissible quagmire of defining religious doctrine and practice. Cf. Serbian E. Orthodox Diocese v. Milivojevich , 426 U.S. 696, 708-09, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976).
Here, the State Superintendent failed to follow these Wisconsin decisions. The articles of incorporation state that "[t]he purposes for which the Corporation is organized are to create, establish, maintain, and operate an interdenominational Christian school for the instruction for children in the primary and secondary grades."[8] Rather than grounding his decision in the articles of incorporation and by-laws as he was required to do under state law, he decided to undertake an independent investigation and rested his decision on statements he found on St. Augustine's website.[9]
Faced with a clear failure of the State Superintendent to follow the decisions of the Supreme Court of Wisconsin, the district court undertook a close examination of Vanko and Holy Trinity . It began its analysis by admitting frankly that, given the holdings in those two cases, the Wisconsin Supreme Court might well "build on these cases" and interpret the statute to require the State Superintendent to approve St. Augustine's proposed area "even though it overlaps with the attendance area of St. Gabriel, and even though both schools describe themselves as Roman Catholic schools."[10] However, the district court then examined the website of St. Augustine School and, noticing that the school described itself as "Catholic," the court then decided that the holdings of the Wisconsin Supreme Court permitted an examination beyond the legal documents of incorporation into the "school's religious denomination."[11] The court apparently never considered abstaining until the parties could obtain a more precise definition of the word "affiliated" than the one offered in Holy Trinity .[12] Rather, it took the *604 School's use of the term "Catholic" as, in effect, an admission of affiliation with the schools of the Archdiocese.[13]
My colleagues follow the lead of the district court. The panel's opinion culls out of the School's self-description on its website the word "Catholic." In their view, if two schools employ the same label-"Catholic"-to describe themselves, they are "affiliated."
In my view, there are several problems with this approach. The first is one of elemental fairness. The term "Catholic" appears in the school website in the broader context of a wide-ranging description of St. Augustine School, a text that sets forth the educational philosophy of the institution and the theological principles that animate that educational philosophy. Taking the single term "Catholic" out of this context and employing it as an outcome-determinative label obviously raises a basic question of fairness, especially when we clearly are forbidden to evaluate the remainder of the context to determine whether the theological principles set forth there are indeed embraced by the Roman Catholic Church, which operates St. Gabriel in the same district.
I recognize, as do my colleagues, that permitting the state to derive denominational affiliation through an examination and judgment of theological doctrine would pose different constitutional concerns. I suggest, instead, that the Constitution requires the state to rely on the same neutral principles it would apply to a non-religious school. It should accept, as the Wisconsin courts certainly would, St. Augustine's independent corporate structure as proof that it is not "affiliated" with St. Gabriel. The materials submitted to the Superintendent made the Superintendent well aware that St. Augustine is legally independent from St. Gabriel and the Archdiocese.[14]
Secondly, the court's selective use of the term "Catholic" rests on the assumption that, for purposes of our Free Exercise analysis, a single term, even when culled from its context, can describe accurately the religious values and aspirations of an individual or a group of individuals. Labels work very well for identifying commodities in a supermarket, but they are ill fitted for protecting the religious liberty of an individual American. Our constitution recognizes "the right of every person to freely choose his own course " with respect to "religious training, teaching and observance." Sch. Dist. of Abington Twp. v. Schempp , 374 U.S. 203, 222, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963) (emphasis added). A cornerstone of our Religion Clauses jurisprudence is the right of each individual to define personal religious beliefs not according to institutional norms but according *605 to personal religious commitments. See Kaufman v. McCaughtry , 419 F.3d 678, 681 (7th Cir. 2005). The congruity of personal beliefs with those of a known religious organization is beside the point. Personal beliefs may have some overlap with an institutional religion; or they may be heretical or overly zealous variations of institutional beliefs. Grayson v. Schuler , 666 F.3d 450, 454 (7th Cir. 2012). They may even evince lax adherence to a known religion. Reed v. Faulkner , 842 F.2d 960, 963 (7th Cir. 1988). But if an individual sincerely holds those beliefs, the Religion Clauses protect them. Grayson , 666 F.3d at 454 ("Religious belief must be sincere to be protected by the First Amendment, but it does not have to be orthodox.").[15]
Given our national commitment to freedom of personal conscience, it is not surprising that our history, even before the founding of the Republic, is filled with dissident individuals and groups who have disagreed with larger bodies and yet insisted that they , not the larger group, have remained faithful to the principles of the original group. As the Supreme Court noted in Thomas v. Review Board of the Indiana Employment Security Division , 450 U.S. 707, 715, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981), "[i]ntra-faith differences ... are not uncommon among followers of a particular creed, and the judicial process is singularly ill equipped to resolve such differences in relation to the Religion Clauses." The "guarantee of free exercise is not limited to beliefs which are shared by all of the members of a religious sect.... [I]t is not within the judicial function and judicial competence to inquire whether [one person or another] correctly perceive[s] the commands of their common faith." Id. at 715-16, 101 S.Ct. 1425.
Today's holding permits a local school board to deny children an important safety protection because their parents have concluded, based on their religious beliefs, that St. Augustine School embodies their personal faith commitment and that the Archdiocesan School does not. The court permits the local school board to exert significant pressure on those parents to bend to the school board's determination that what they believe to be an important religious difference between the two schools does not exist or is inconsequential. It also rejects the Supreme Court's explicit statement that, when the state conditions receipt of an important benefit program upon acceptance of such a government determination, it places "substantial pressure" on the individual to modify his behavior and "a burden upon religion exists." Id. at 718, 101 S.Ct. 1425. "While the compulsion *606 may be indirect, the infringement upon free exercise is nonetheless substantial." Id. ; see also Abington Twp. , 374 U.S. at 221, 83 S.Ct. 1560.
Today's decision therefore raises very concrete concerns beyond our achieving substantive justice for the parties before us. What will the court now do when individuals identifying themselves as Anglican Catholics, Polish Catholics, or Orthodox Catholics seek to raise their children according to their own faith traditions? Barred from making any theological inquiry, will the court again rely on labels? What will it do when individuals identifying as Missouri Synod Lutherans seek to establish a facility separate from those identifying as Evangelical Lutherans? Will Methodists and United Methodists experience the same problem? As the ecumenical movement grows and individuals simply identify as "Christian," how will the court deal with the differences that still remain? Will the court recognize the right of those who identify as Orthodox Jews to nurture their faith in schools separate from Reformed or Liberal Jews? Other analogous situations surely will arise as society continues to grow more and more pluralistic in its religious beliefs. Today, the court simply puts these very pragmatic but important questions off for another day; it ignores that its label methodology is simply unworkable in these situations. The majority opinion "assume[s] that the Missouri Synods would be entitled to argue that they are a different group from the Evangelicals, that the Orthodox Jews are entitled to argue that they are a different group from Reformed Jews, and that Shi'a Muslims can urge that they are different from Sunnis."[16] Why, then, is St. Augustine foreclosed from arguing that it is governed by a separate entity than that which governs St. Gabriel's?
Today's decision raises more than pragmatic problems. It raises haunting concerns about the future health of the Religion Clauses in this circuit. It is indeed difficult to square today's decision with the Supreme Court's recent reaffirmation that "denying a generally available benefit solely on account of religious identity imposes a penalty on the free exercise of religion." Trinity Lutheran Church of Columbia, Inc. v. Comer , --- U.S. ----, 137 S.Ct. 2012, 2019, 198 L.Ed.2d 551 (2017). It is equally difficult to square this decision with the basic tenet of the Supreme Court's Religion Clauses jurisprudence that the Constitution protects not only the "freedom to believe" but "the freedom to act." Cantwell v. Connecticut , 310 U.S. 296, 303-04, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). Today's exercise in label reading is not consistent with our careful protection of the individual liberty to adhere to, and act on, one's personal religious beliefs. Accordingly, I respectfully dissent.

See Wis. Const. art. I, § 23.

Wisconsin Statutes section 121.54(2)(b) requires the school board of each district operating high school grades to provide transportation "for each pupil residing in the school district who attends any elementary ... or high school grade at a private school located 2 miles or more from the pupil's residence, if such private school is a school within whose attendance area the pupil resides and is situated within the school district." This transportation obligation can be fulfilled in a variety of ways. See Wis. Stat. § 121.55. This school district's choice of the way in which it would fulfill such an obligation is not at issue in this case.

We need not decide today whether the Constitution of the United States requires such evenhanded treatment of public and non-public school students. See Trinity Lutheran Church of Columbia, Inc. v. Comer , --- U.S. ----, 137 S.Ct. 2012, 198 L.Ed.2d 551 (2017).

Wis. Stat. § 121.51(1).

Id. (emphasis added). The single-sex school exception is not implicated in this case.

The court later referred to this last explanation as dicta. See Holy Trinity Cmty. Sch., Inc. v. Kahl , 82 Wis.2d 139, 262 N.W.2d 210, 212 (1978).

The majority maintains that the Wisconsin Supreme Court said in Holy Trinity that a court "generally must accept the school's own profession of affiliation or non-affiliation." Majority Op. at 597. Its citation to 82 Wis.2d at 155-58, 262 N.W.2d 210 apparently refers to the Wisconsin court's discussion of the judicial obligation not to pierce the articles of incorporation or the bylaws. There, the Supreme Court of Wisconsin observers: "we hold only, where a religious school demonstrates by a corporate charter and bylaws that it is independent of, and unaffiliated with, a religious denomination, that in the absence of fraud or collusion the inquiry stops there. To make the further inquiry, as attempted by the Superintendent of Public Instruction, is to involve the state in religious affairs and to make it the adjudicator of faith." Holy Trinity , 82 Wis.2d at 157-58, 262 N.W.2d 210.

R.26-1 at 1.

See R.26-10 at 7.

R.41 at 16.

Id. at 13. The district court noted that Vanko had described the required nexus as "affiliated or operated by a single sponsoring group." Id. It read Holy Trinity as not limiting the inquiry to the private school's constituent documents if those documents do not affirmatively disclose that the school has a particular affiliation. Id. at 15. That interpretation is belied by the Holy Trinity court's reliance on Bradfield v. Roberts , 175 U.S. 291, 297, 20 S.Ct. 121, 44 L.Ed. 168 (1899), in which the operative document did not disclose the religious affiliation of the institution. See id. at 297-98, 20 S.Ct. 121 ("Nothing is said about religion or about the religious faith of the incorporators of this institution in the act of incorporation.... Whether the individuals who compose the corporation under its charter happen to be all Roman Catholics, or all Methodists, or Presbyterians, or Unitarians, or members of any other religious organization, or of no organization at all, is of not the slightest consequence with reference to the law of its incorporation, nor can the individual beliefs upon religious matters of the various incorporators be inquired into.").

Notably, the defendants had removed this case from the state court where the plaintiffs had commenced the action. The state court no doubt would have followed the Wisconsin precedent discussed in the text and concluded that the Superintendent was not permitted to ignore St. Augustine's claim of legal independence.
The defendants' removal of this case to federal court simply has allowed them to avoid answering to the Wisconsin Supreme Court for their failure to follow Trinity Lutheran , 137 S.Ct. at 2024. Had they obeyed the holding of that case, they would have treated religious and non-religious schools evenhandedly and, in the process, avoided any need to address a constitutional question.

Earlier in its opinion, the district court had surmised that St. Augustine might be "Traditionalist Catholic." R.41 at 3. It then said that it mentioned this point "only to provide some background information on how St. Augustine differs from a diocesan school." Id.

See, e.g. , R.26-9 (St. Augustine's request for Superintendent to review the school district's denial of transportation benefits, emphasizing St. Augustine's independence from the Archdiocese and separately chartered corporate structure); R.33-6 at 3-4 (school district's submission to Superintendent, recognizing that St. Augustine is "incorporat[ed] under a different charter" and has a "differing organizational structure[ ]" from an Archdiocesan school).

We have held that the government may inquire into the sincerity of a person's beliefs, Grayson v. Schuler , 666 F.3d 450, 454 (7th Cir. 2012), and that it can be appropriate to examine, in a measured and non-intrusive manner, the congruity of a person's beliefs to those of the religion that he professes in an effort to ascertain the sincerity of his beliefs, Nelson v. Miller , 570 F.3d 868, 880-82 (7th Cir. 2009). But see Koger v. Bryan , 523 F.3d 789, 799-800 (7th Cir. 2008). Similarly, civil government need not tolerate sham or fraudulent conduct designed to avoid legitimate and evenhandedly applied civil obligations. See, e.g. , Welsh v. United States , 398 U.S. 333, 339-40, 90 S.Ct. 1792, 26 L.Ed.2d 308 (1970) (noting that it is necessary to consider whether an individual's beliefs are, in fact, "religious" in nature before granting that individual conscientious objector status under the Selective Service Act); United States v. Seeger , 380 U.S. 163, 185, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965) ("[W]e hasten to emphasize that while the 'truth' of a belief is not open to question, there remains the significant question whether it is 'truly held.' This is the threshold question of sincerity [and ]a prime consideration to the validity of every claim for exemption as a conscientious objector."). But, in the end, it is the sincerity of their beliefs, not their orthodoxy, that is the touchstone for constitutional protection. These are well-settled principles.

Majority Op. 599-60.