In the

# United States Court of Appeals

## For the Seventh Circuit

No. 08-3094

JULIE STEPHENS LONG,

*Plaintiff-Appellant*,

*v.*

TEACHERS' RETIREMENT SYSTEM OF
THE STATE OF ILLINOIS,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 06-3194—**Richard Mills**, *Judge.*

ARGUED JANUARY 20, 2009—DECIDED OCTOBER 23, 2009

Before EASTERBROOK, *Chief Judge*, SYKES, *Circuit Judge,*
and KENDALL, *District Judge.*[*]

KENDALL, *District Judge.* Julie Stephens Long's employ-
ment with the Teachers' Retirement System of the State
of Illinois ("TRS") came to an end on February 3, 2006.

---

[*] Hon. Virginia M. Kendall, District Judge for the Northern
District of Illinois, is sitting by designation.

While TRS maintains that it fired her for poor perform-ance, Long believes that she was fired in retaliation for taking leave under the Family and Medical Leave Act ("FMLA"). The district court granted summary judgment in favor of TRS, which Long now appeals. For the follow-ing reasons, we affirm.

## I. Background

TRS administers the pension plan that provides monthly retirement benefits to approximately 82,000 retired teachers throughout Illinois.

Jon Bauman served as the Executive Director of TRS. He held ultimate responsibility for the organization's day-to-day activities and he possessed final decision-making authority for all disciplinary actions including the suspension and termination of employees. Human Re-sources Director, Gina Larkin, reported directly to Bauman and oversaw all personnel activities at TRS. Before disciplining an employee, Larkin worked in con-junction with the appropriate department manager in order to determine a recommended course of action that she would present to Bauman.

At TRS, the Member Services Division facilitates all retirement, disability and survivor benefit claims. Terry Viar, Director of Member Services, reported directly to Bauman and oversaw the payment of benefits to TRS members. The Benefits Department, a subsection of Member Services, processes all retirement benefits. Deputy Director of the Benefits Department Sally Sherman man-

aged the Benefits Department and reported directly to Viar.

To expedite the payment of benefits, TRS allows its members to receive their benefits through an electronic fund transfer ("EFT"), whereby TRS deposits benefit payments directly into a member's bank account. Within the Benefits Department, the Payroll and Insurance Department ("Payroll") processes direct deposit forms for members opting to receive their payments via EFT. Payroll Insurance Manager Marshall Branham oversaw the daily administration of benefits for TRS members, including the timely processing of EFT payments. Branham reported to Sherman.

Long began working at TRS in September, 1985. Starting in 2000, Long worked in Payroll in the position of Payroll Clerk IV. Her primary responsibilities included enrolling members in the EFT program, entering EFT information into a database, verifying bank routing and account numbers and responding to change of address requests from beneficiaries. Branham was Long's direct supervisor.

When she initially started in Payroll, Long received favorable performance reviews. Over time, though, errors in her work and increasing absences led to lower reviews. In June 2005, she missed 25% of her scheduled working days. In July 2005, her absences rose to 40% of her scheduled days. Additionally, although Branham asked Long in 2004 to train employees from other departments on the EFT process, she had not done so as of June 2005. On July 26, 2005, Branham met with Long to inform her that because of her absenteeism, he planned

on withdrawing his recommendation that she receive a promotion. Long agreed with his assessment regarding her absenteeism. At the meeting, Branham also instructed her to train employees within the Data Services Department on the EFT process by September 2005.

In September 2005, TRS traced several errors within the EFT system to Long. For example, she improperly recorded a bank account number which resulted in TRS sending a member's benefit payment to the wrong location. She also improperly documented an address which resulted in a member's estranged ex-wife receiving sensitive financial information about the member. On September 14, 2005, the members called TRS to complaint about the difficulty they had receiving their benefit payments. Although Long had responsibility for responding to member communications regarding EFT transactions, she was absent from work that day, so other TRS employees fielded the calls. The next day, Branham met with Long to discuss her EFT errors and the impact that her absences had on other TRS employees. Branham also informed Long that she had not processed payroll deduction plan applications in a timely manner which resulted in TRS moving responsibility for processing the applications to another department. Once again, Branham urged Long to train other TRS employees on the EFT process. He summarized the meeting in a memorandum dated September 20, 2005.

In the fall of 2005, Larkin held two meetings with Branham and Sherman to discuss Long's performance. Through the meetings, Larkin learned that Long entered

incorrect addresses in the EFT database, entered incorrect routing numbers and did not complete her tasks in a timely manner. She also discovered that in addition to the member complaints that TRS received, Long's fellow employees complained about her performance. Branham and Sherman informed Larkin of their belief that Long's errors resulted in TRS failing to get its checks to its members.

Based on Long's many absences, on September 26, 2005, Sherman informed Long that she might be eligible for leave under the FMLA. Long then applied for intermittent FMLA leave for medial epicondylitis (tennis elbow). TRS approved her request for FMLA leave in October and instructed Long to notify her supervisors when she would be absent because of her medical condition. Long informed TRS that her absences on September 22 and 28, 2005 were related to the condition. In November 2005, Long modified her FMLA application to request intermittent leave to treat ovarian cysts. After TRS approved the revised application on December 2, 2005, Long informed her employer that the following absences related to FMLA leave: October 13, 14, 20, 21, 24 and 28; November 3, 7, 8, 9, 10, 14, 15 and 18; and January 5, 2006. She was also absent from work for nine days in December 2005 and five days in January 2006. The record indicates that those absences were not FMLA-related.

In late December 2005 or early January 2006, Larkin met with Branham and Sherman again. At the meeting, Branham and Sherman informed Larkin that Long's

performance had not improved, and as a result, TRS failed to get benefits payments to its members. Branham also told Larkin that he found a large backlog of EFT forms that Long had not entered into the system on several occasions. Branham expressed frustration with Long's absenteeism and suggested that TRS should fire Long.

After receiving Branham's suggestion, Larkin reviewed Long's performance evaluations, the member complaints related to her work and the comments from Branham and Sherman. Larkin then met with Bauman twice in January 2006 to discuss Long's performance. At the January 31, 2006 meeting, Larkin recommended that Bauman terminate Long. After reviewing Long's performance evaluations and discussing member complaints with Branham, Bauman decided to fire Long on February 3, 2006 based upon the member complaints and the misdirected checks. When he made the decision to fire her, Bauman did not have any knowledge of Long's FMLA leave.

On August 31, 2006, Long filed suit, claiming that TRS fired her in retaliation for taking FMLA leave. The district court granted summary judgment for TRS, finding that Long failed to create a genuine issue of fact as to whether TRS fired her in retaliation for taking FMLA leave.

## II. Discussion

We review a district court's grant of summary judgment de novo, viewing the facts and all reasonable inferences in the light most favorable to the non-moving party.

*See Ridings v. Riverside Med. Ctr.*, 537 F.3d 755, 760 (7th Cir. 2008). Summary judgment is proper when "there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). To defeat a motion for summary judgment, the non-moving party must present more than just "bare allegations." *de la Rama v. Ill. Dept. of Human Servs.*, 541 F.3d 681, 685 (7th Cir. 2008). The non-moving party must present " 'evidence on which the jury could reasonably find for the nonmoving party.' " *Id.* (quoting *Rozskowiak v. Vill. of Arlington Heights*, 415 F.3d 608, 612 (7th Cir. 2005)).

As a preliminary matter, Long attempts to question the district court's decision to strike portions of her affidavit that contradicted her previous deposition testimony. Although she has not formally presented the issue for review, she implicitly questions the ruling at several points in her brief and states in a footnote that "the district court erroneously struck portions of Long's affidavit." Long does not develop the argument or cite to specific portions of the record that would illustrate how the district court erred.

To present an argument on appeal, a party must develop its position by providing citation to the relevant portions of the record and supporting authority. *See* Fed. R. App. P. 28(a)(9)(A). "[U]nsupported and underdeveloped arguments are waived." *United States v. Turcotte*, 405 F.3d 515, 538 (7th Cir. 2005). A party may waive an argument by disputing a district court's ruling in a footnote or a one-sentence assertion that lacks citation to record evidence. *See Beamon v. Marshall & Ilsley Trust Co.*, 411 F.3d 854, 862

(7th Cir. 2005); *see also United States v. White*, 879 F.2d 1509, 1513 (7th Cir. 1989) (argument raised in passing in a footnote deemed waived).

In claiming that the district court erred in striking portions of Long's affidavit that conflicted with her deposition testimony, Long does not identify the proper standard of review or the legal standard for striking self-serving affidavits as inapposite to deposition testimony. Her statement contains no citation to the record to show which portions of the affidavit she believes were improperly stricken or why they were improperly stricken. Because Long has failed to properly present the issue of whether the district court erred in striking portions of her affidavit, she has waived the argument.

The FMLA allows eligible employees to take unpaid leave to tend to a serious health condition. *See* 29 U.S.C. § 2612. Additionally, the FMLA prohibits employers from discriminating against employees who have taken FMLA leave. *See* 29 U.S.C. § 2615; *see also King v. Preferred Technical Group*, 166 F.3d 887, 891 (7th Cir. 1999). An employee may proceed under the direct or indirect methods of proof to establish a prima facie case of retaliation under the FMLA. *See Ridings*, 537 F.3d at 771. Long attempts to proceed under the direct method only.

A plaintiff proceeding under the direct method of proof must produce direct or circumstantial evidence that "the protected conduct was a substantial or motivating factor in the employer's decision." *Lewis v. Sch. Dist. #70*, 523 F.3d 730, 741-42 (7th Cir. 2008). To establish a prima facie case of retaliation under the direct method of proof,

the plaintiff must present evidence of "(1) a statutorily protected activity; (2) a materially adverse employment action taken by the employer; and (3) a causal connection between the two." *Caskey v. Colgate-Palmolive Co.*, 535 F.3d 585, 593 (7th Cir. 2008). Direct evidence typically consists of an admission by the decisionmaker that he acted with retaliatory intent. *See id.* Circumstantial evidence allows the finder of fact to infer that retaliatory animus motivated the decisionmaker to take an adverse employment action against the employee. *See id.* Circumstantial evidence may include suspicious timing, ambiguous oral or written statements, or behavior toward or comments directed at other employees in the protected group. *See Nichols v. S. Ill. Univ.-Edwardsville*, 510 F.3d 772, 782 (7th Cir. 2007).

The parties do not dispute that Long engaged in a protected activity when she took FMLA leave or that she suffered an adverse employment action when TRS terminated her. To support her contention TRS fired her because she took FMLA leave, she offers the following pieces of circumstantial evidence: Branham's statements, failure of TRS to follow its internal discipline procedures when it fired her and the "sudden decline" in her performance reviews around the time that she took leave.

Long claims that Branham recommended to Bauman and Larkin that TRS should fire Long because he held animus towards her for taking FMLA leave. To support that contention, she points to several of Branham's statements regarding her absences. For example,

Long points to a memorandum that Branham drafted to memorialize a meeting that he held with Long. In the memo, Branham noted that he met with Long to discuss her absences and the impact that the absences had on Payroll's overall workload. Additionally, in his deposition, Branham stated that absenteeism affected Long's performance from June 2005 through January 2006. He attributed some of Payroll's overall problems to Long's absences, such as EFT backlogs and missed member complaints. He also stated that Long's absences had a negative impact on the morale of other Payroll employees because they had to perform Long's duties in addition to their own during her absences.

Although Long claims that Branham's memo provides evidence of his retaliatory animus towards her FMLA leave, Branham met with Long and drafted the memo before she even applied for FMLA leave. Branham met with Long to discuss her absences and EFT errors on September 15, 2005. On September 20, 2005, he drafted his memo to summarize the meeting. Sherman did not inform Long about her potential eligibility for FMLA leave until September 26, 2005, days after Branham held the meeting and drafted the memo that discussed Long's absences. Because Long had not even applied for FMLA leave when Branham discussed Long's absences and drafted the memo to summarize the meeting, those statements that he made in the meeting and the memo cannot provide evidence that he held a retaliatory animus towards Long's use of FMLA leave. *See Durkin v. City of Chicago*, 341 F.3d 606, 614-15 (7th Cir. 2003) ("An employer cannot retaliate if there is nothing for it to retaliate against.").

Long also claims that Branham's statements during his deposition reveal that he held a retaliatory animus towards her based on her FMLA leave. Although he attributed Long's performance problems to her many absences, he stated that her absences from June 2005 through January 2006 created problems such as EFT backlogs and missed member complaints. Long's string of absenteeism began in June 2005 when she missed 25% of her scheduled days, and continued into July 2005 when she missed 40% of her scheduled days. On July 26, 2005, Branham held a meeting with Long to inform her of the toll that her absenteeism was taking on her performance when he told her that he had to withdraw his recommendation that she receive a promotion based solely on her many absences. In September 2005, before she even applied for FMLA leave, Branham traced many errors within Payroll to Long and held a meeting with her on September 15, 2005 to discuss her performance issues. Even when TRS approved her application for FMLA leave in October and she indicated that some of her previous absences were related to her medical condition, the earliest date that she indicated was September 22, 2005, after Branham had already documented that her absences were negatively affecting her performance. Any comment that Branham made regarding absences before Long even applied for FMLA leave could not have been evidence of a retaliatory intent on his part.

Even assuming that Branham's deposition testimony reveals that he held retaliatory animus towards Long, to demonstrate a causal connection between a protected

activity and an adverse employment action, "a plaintiff must provide direct or circumstantial evidence that the *decisionmaker* has acted for a prohibited reason. A decisionmaker is the person 'responsible for the contested decision.'" *Rogers v. City of Chicago*, 320 F.3d 748, 754 (7th Cir. 2003) (emphasis in original) (quoting *Chiaramonte v. Fashion Bed Group, Inc.*, 129 F.3d 391, 396 (7th Cir. 1997)). "Statements by subordinates normally are not probative of an intent to retaliate by the decisionmaker." *Willis v. Marion County Auditor's Office*, 118 F.3d 542, 546 (7th Cir. 1997).

At TRS, only Bauman has the authority to make personnel decisions regarding employee discipline, including whether to suspend or terminate an employee. Branham only recommended to Larkin that TRS should fire Long; he did not make the ultimate decision. Bauman made the decision after consulting with Larkin, Branham and Sherman. Therefore, even if Branham held retaliatory animus towards Long, to show a causal connection between her FMLA leave and her termination, she must show that Bauman acted for a prohibited reason. The record does not contain any evidence that Bauman fired Long because she took FMLA leave; in fact, the record shows that he did not even know that Long took FMLA leave when he fired her. Because Bauman did not know that Long took FMLA leave, he could not have possibly terminated her for that reason.

Although a plaintiff must generally provide evidence that the decisionmaker acted for a prohibited reason to establish a prima facie case of retaliation, courts have

imputed the retaliatory intent of a subordinate to an employer in situations where the subordinate exerts significant influence over the employment decision. *See, e.g.*, *Metzger v. Ill. State Police*, 519 F.3d 677, 682 (7th Cir. 2008); *Brewer v. Bd. of Trs. of the Univ. of Ill.*, 479 F.3d 908, 917-18 (7th Cir. 2007); *Rozskowiak*, 415 F.3d at 613; *Rogers*, 320 F.3d at 754 (noting potential for employer liability if decisionmaker merely "rubber-stamped" a biased subordinate's recommendation). This theory of liability, known as the "cat's paw" doctrine, *see Willis*, 118 F.3d at 547, has received inconsistent treatment in this Circuit. Some cases hold that a subordinate must have a "singular influence" over the employment decision, *see Staub v. Proctor Hosp.*, 560 F.3d 647, 659 (7th Cir. 2009), and others do not draw such a bright line, *see Shager v. Upjohn*, 913 F.2d 398, 405 (7th Cir. 1990). In *Shager v. Upjohn*, for example, the court found that evidence of "taint" and "influence" by a non-decisionmaker made the decisionmaker a "conduit of [his] prejudice." *See id.* The court did not suggest, however, that the subordinate's influence must be "singular," focusing instead on the lack of independent deliberation by the decision-making committee. *See id.* This approach was largely replicated in *Metzger*, where the court emphasized the lack of evidence of any "improper influence" by the subordinate and the independent nature of the decision-making. *See* 519 F.3d at 682. Other cases, however, suggest that the cat's paw doctrine only applies where a "decision maker is . . . wholly dependent on a single source of information." *See Brewer*, 479 F.3d at 917-18. The court's decision in *Staub*, for instance, held that "to be a cat's paw requires . . .

a blind reliance, the stuff of 'singular influence.'" *See Staub*, 560 F.3d at 659.

The Court merely notes this internal conflict for the record. It need not reconcile these approaches today for several reasons. First, Long is only claiming that a single subordinate (Branham) was the source of the retaliatory animus that Long seeks to impute to Bauman. Moreover, regardless of the approach that one adopts, an independent investigation by the decisionmaker weighs heavily against a finding of excessive influence. *See Staub*, 560 F.3d at 659; *see also Metzger*, 519 F.3d at 682; *Willis*, 118 F.3d at 547. Here, Bauman relied on information from several different sources before arriving at the decision to fire Long. After Branham recommended that TRS should fire Long, Larkin gathered information on her own by reviewing information from Sherman, member complaints and Long's performance evaluations. Larkin then held two meetings with Bauman to discuss the situation before she made her own recommendation that TRS should fire Long. After receiving Larkin's input, Bauman reviewed the information relating to Long independently. While Branham met with Bauman to discuss the member complaints that Payroll had received, Branham did not control all of the information that Bauman had to evaluate the recommendation to terminate Long. The set of data available to Bauman consisted of information provided by Branham, Sherman and Larkin. Nothing in the record suggests that Branham exerted singular influence over Bauman's decision or that Bauman merely "rubber-stamped" Branham's recommendation; to the contrary, the undisputed facts show

that Bauman reviewed multiple sources of information on his own, held at least three meetings and received Larkin's independent recommendation before deciding to fire Long. While Long questions the thoroughness and independence of Bauman's investigation, the record shows that Bauman was not wholly dependent on a single source of information and reviewed the facts relevant to the decision on his own, which is all that he was required to do to absolve TRS of potential liability under the cat's paw theory. *See Staub*, 560 F.3d at 659; *Brewer*, 479 F.3d at 918.

Therefore, even if Branham's deposition provided some evidence that he harbored a retaliatory animus towards Long's FMLA leave, the record shows that Bauman, who did not even know that Long took FMLA leave, acted as the ultimate decisionmaker. Long has not introduced evidence that would provide a basis for imputing a retaliatory animus from Branham to Bauman because Branham did not exert singular influence over Bauman's decision. Accordingly, Branham's statements regarding Long's absenteeism do not provide her with evidence that TRS fired her because she took FMLA leave.

Long also offers TRS's failure to follow its own internal discipline procedures as evidence of TRS's retaliatory intent in firing her. An employer's departure from its own employment policies can constitute circumstantial evidence of discrimination. *See Rudin v. Lincoln Cmty. Coll.*, 420 F.3d 712, 723 (7th Cir. 2005); *Giacoletto v. Amax Zinc Co., Inc.*, 954 F.2d 424, 427 (7th Cir. 1992). However, when a progressive discipline policy permits the

employer to exercise discretion in discharging an employee without exhausting all of the policy's steps, failure to follow all of the steps does not suggest a discriminatory motive. *See Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 541 (7th Cir. 2007); *Hague v. Thompson Distrib. Co.*, 436 F.3d 816, 828 (7th Cir. 2006).

TRS's Employee Discipline Policy utilizes a progressive discipline plan, where the disciplinary steps typically follow this pattern: (1) oral warning and informal counseling; (2) written warning and counseling; (3) suspension; and (4) discharge. However, the policy also states, "[d]epending on the facts and circumstances involved in each situation, management may choose to begin disciplinary action at any step." Additionally, "[f]or certain major violations or continued failure to respond to prior disciplinary action, discharge may be the only recourse." When skipping to the discharge step, TRS's procedures require the supervisor and division head to make recommendations for discharge to the Director of Human Resources.

Here, the record evidence shows that TRS began to discipline Long for her absenteeism by giving her an oral warning. On July 26, 2005, Branham informed Long that he would no longer support her promotion because of her excessive absenteeism during the months of June and July 2005. Additionally, Branham met with Long twice in September 2005 to discuss late processing of payroll deduction plan applications, EFT errors, Long's failure to train other staff in EFT procedures and complaints from members and coworkers relating to

Long's EFT work. Despite these warnings, Branham discovered a large backlog of EFT forms on several occasions in late 2005 and early 2006. On multiple occasions, Long did not deliver groups of EFT slips to the Data Services Department for processing until the day before the cut-off date when TRS's procedures called for the slips to be delivered on a daily basis so that Data Services could spread out its processing of the forms. This delay forced Data Services to process all of the EFT forms in a single day to ensure timely payment of member benefits.

After discovering this backlog of EFT forms several times, Branham, Sherman and Viar recommended to Larkin that Long should be fired. This recommendation complied with TRS's policy that required the supervisor and division head to make recommendations for discharge to the Director of Human Services. Although TRS's policy allows for progressive discipline, it also allows for termination in the event of continued failure to respond to previous warnings. Long received oral warnings on at least three occasions beginning in July 2005 before her termination in February 2006. Therefore, because Long received several warnings before termination and because TRS had the ability to begin disciplinary action at any step, TRS did not violate its disciplinary policy when Long was terminated.

Long points out that under TRS's policy, in circumstances that could result in immediate termination, a supervisor must submit a written request detailing the incident to the division head, the Director of Human Resources and the Executive Director. Because Branham

orally informed Larkin of his recommendation that Long should be fired, Long claims that TRS's policy was violated when it fired her. TRS counters that it only has an obligation to make written recommendations for termination when an employee commits "a single, severe, or atrocious policy violation" that constitutes a fireable offense. Because TRS and Branham provided oral warnings to Long beginning in late July 2005, approximately six months before the date of her termination, TRS claims that Long's termination was not an "immediate termination" under the policy, but rather the result of repeated instances of substandard performance.

Because the disciplinary policy allowed for TRS to terminate Long under the circumstances, the actual decision to terminate Long did not violate the policy. If the policy was violated at all, it was when Branham orally recommended Long's termination to Larkin instead of providing Larkin with a written report outlining the reasons that he believed that TRS should fire Long. When TRS has the authority to terminate an employee, the fact that a manager made his recommendation orally instead of in writing does not provide circumstantial evidence of retaliatory intent. Under the policy, Branham had the authority to recommend Long's discharge based upon her poor job performance. The fact that he did so orally rather than in writing does not permit the inference that TRS discharged Long in retaliation for taking FMLA leave.

Finally, Long claims that the decline in her performance evaluations provides circumstantial evidence that TRS

terminated her in retaliation for taking FMLA leave. "[A]n employer's sudden dissatisfaction with an employee's performance after that employee engaged in a protected activity may constitute circumstantial evidence of causation." *Culver v. Gorman & Co.*, 416 F.3d 540, 546 (7th Cir. 2005).

Here, Long claims that her "exemplary track record belies any suggestion that her performance suddenly changed." She contends that "the fact that an employee had consistently overperformed expectations for more than twenty years and then all of a sudden becomes a bad employee is simply not logical." Despite these contentions, the record shows that TRS first documented a decline in Long's performance in June and July 2005, when she missed 25% and 40% of the working days in each month, respectively. On July 26, 2005 and September 15, 2005, Branham met with Long to discuss her declining performance. In the meetings, Branham discussed her absenteeism in addition to several EFT errors attributable to her that caused delayed benefit payments to members and the disclosure of a member's personal information to a third party. During the meetings, Branham also informed Long that she had not timely processed several payroll deduction plans.

Branham documented those deficiencies in Long's performance before September 22, 2005, the date of her first FMLA-related absence. While a sudden decline in performance evaluations after an employee engages in a protected activity may provide circumstantial evidence of discriminatory intent, a decline in performance

before the employee engages in protected activity does not allow for an inference of retaliation. *See Durkin*, 341 F.3d at 614-15 ("It is axiomatic that a plaintiff engage in statutorily protected activity before an employer can retaliate against her for engaging in statutorily protected activity . . . . An employer cannot retaliate if there is nothing for it to retaliate against."). Because Branham first documented a decline in Long's performance in June 2005, at least three months before Long ever took FMLA leave, the decline in Long's performance evaluations cannot provide circumstantial evidence of retaliatory intent.

## III. Conclusion

Because Long has failed to present evidence that TRS acted with retaliatory intent when it fired her, a jury could not infer that TRS fired her because she took FMLA leave. Therefore, the district court's grant of summary judgment is AFFIRMED.