In the

# United States Court of Appeals

## For the Seventh Circuit

---

No. 15-2795

CARLA BOSTON,

*Plaintiff-Appellant,*

*v.*

U.S. STEEL CORPORATION,

*Defendant-Appellee.*

---

Appeal from the United States District Court for the
Southern District of Illinois.
No. 13-cv-00532 — **David R. Herndon**, *Judge.*

---

ARGUED FEBRUARY 10, 2016 — DECIDED MARCH 4, 2016

---

Before BAUER, FLAUM, and SYKES, *Circuit Judges.*

FLAUM, *Circuit Judge.* Plaintiff-appellant Carla Boston worked at defendant-appellee U.S. Steel Corporation ("U.S. Steel") for eighteen years before she was laid off in December 2008, along with a number of other employees. While on layoff status, Boston remained eligible to bid on posted positions for which she was qualified. Between September 2010 and January 2012, Boston was awarded, and subsequently

disqualified from, three different clerical positions at the plant.

On April 10, 2012, Boston filed a complaint with the Equal Employment Opportunity Commission ("EEOC") asserting that she was laid off on January 10, 2012 in retaliation for an earlier EEOC discrimination charge she had filed in October 2010. She filed suit in federal court on June 3, 2013, seeking relief for retaliation under Title VII and the Age Discrimination and Employment Act ("ADEA"). She also asserted a common law claim for intentional infliction of emotional distress ("IIED"). The district court granted U.S. Steel's motion for summary judgment as to both claims. We affirm.

## I. Background

Carla Boston worked for U.S. Steel (formerly the National Steel Corporation) at Granite City Works from January 1991 until she was laid off in December 2008. She was hired initially as a Secretary in the Engineering Department. Labor employees at Granite City Works, including Boston, are represented by the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union ("the Union"). The Basic Labor Agreement ("BLA") negotiated by U.S. Steel and the Union governs the terms of employment for these employees.

During her first eighteen years of employment, Boston performed engineering requests for vendors, ordered supplies, ensured that computers and printers were functioning properly, and used various computer systems to keep notes and spreadsheets and place orders. There is no indication that Boston was anything other than a capable and compe-

tent employee during this period. On December 7, 2008, Boston was laid off from her position in the Engineering Department along with a number of other employees at the plant.

### A. October 2010 Disqualification

Boston remained on layoff status until she bid on a Clerical II position in the Basic Oxygen Furnace ("BOF") Department. Boston was awarded the job and started work on September 13, 2010. The BLA provided a thirty-day training period for the new position.

There is a dispute over Boston's performance in the BOF position. U.S. Steel asserts that it quickly became apparent to Boston's supervisors that she was not showing sufficient progress. Boston, for her part, offers a different account of her time in the BOF Department. She notes that Neil Witt, a division manager, claimed her computer skills were deficient but that Witt was not responsible for evaluating her. One of Boston's direct supervisors, Tom Kurilla, also stated that she lacked Microsoft Excel skills. But when Kurilla was asked whether Boston's computer skills impeded the completion of projects, he replied, "No, that I'm aware of."

Additionally, Witt allegedly told Boston he was surprised to learn that she was sixty-one years old. He asked how long she planned to work and said he did not want to train her if she was going to leave. Boston also contends that Witt and Kurilla came into her office one evening, stood over her in a threating manner, and told her there was a young man in engineering who had bid for her job. Witt purportedly said: "[W]e are very gun shy here about a woman being on this job. The last two women had walked off the job." On

October 1, another supervisor, Doug Wood, who Boston claims was complicit in failing to train her, allegedly threatened Boston that if she told anyone he was not training her, he would "throw her to the wolves."

At the end of the thirty-day training period, Boston's supervisors in the BOF Department recommended returning Boston to her previous position. Boston claims that Witt disqualified her around October 8, 2010, without writing up a report detailing the reasons for this action. According to Boston, a male was hired to fill Boston's position after she left. Boston returned to layoff status.

At some point after the BOF disqualification, Boston was hired as a data entry employee for Bechtel Engineering at the Wood River Refinery. Boston alleges that her new employer was satisfied with her performance. Boston says she left this position to bid on a position in U.S. Steel's Human Resource Security, or Pass Control, Department.

### B.  October 2010 EEOC Discrimination Charge

Boston filed an EEOC charge on October 26, 2010 alleging that she was disqualified from the BOF Clerk position because of her age and sex. The EEOC dismissed Boston's 2010 charge and she received a Notice of Suit Rights on December 28, 2011. Boston did not file suit against U.S. Steel based on the conduct alleged in the October 2010 EEOC charge within the prescribed ninety-day filing period.

### C. May 2011 Disqualification

Boston bid on a Clerical II position in the Pass Control Department and was awarded the position on April 11, 2011.

U.S. Steel asserts that Boston again failed to demonstrate an ability to fulfill the job requirements. But Boston claims that no one gave her a copy of the Pass Control Manual for her own use and study, and that the department administered an exam based on this manual. She also contends that she was not trained for various tasks she was asked to carry out, such as changing cartridges in a badging machine. Boston was tested on the cartridge change and could not complete the task. She was also tested on various computer systems to which she was not granted access.

Boston was disqualified from the Pass Control position after the thirty-day period. She returned to layoff status. Following the Pass Control disqualification, the Union filed a grievance on Boston's behalf asserting that she was not adequately trained to perform the job. The grievance was denied.

### D. January 2012 Disqualification

Boston then bid on another Clerical II position in Maintenance and Operations in the Ironmaking Department ("Ironworks"). She was awarded the position and started work on December 12, 2011. Michelle Fields, an Ironworks Manager, was Boston's supervisor. An Administrative Assistant in Ironworks, Marcia Graham, was assigned to train Boston. Graham was the only other clerical staffer in Ironworks at that time. Graham was tasked with training Boston to perform the various duties of the clerical position, including "missed list procedures." The missed list is a list of

missed inspections that are to be performed in the plant, including maintenance and electrical inspections. According to U.S. Steel, mistakes associated with the missed list put the department at risk of being written up by auditors. U.S. Steel asserts that during training, Boston had access to a computer in her office and was provided with at least fifty-eight pages of computer "screen prints" so Boston could take notes as she and Graham worked through tasks. However, Boston claims that she was not provided with computer access and was not trained on any computer program.

Graham kept notes on Boston's training and, in late December, expressed concern that "[Boston] wasn't learning." On December 21, 2011, Boston left Graham a voicemail stating, in part:

> I just wanted to tell you don't give up on me. I know it's been kind of a little rough day today. But uh, we'll get that computer up and running and I will sit down and figure this job out I promise you … [W]e'll hit it hard when I get back and thanks a lot and thanks for your patience.

The plant was closed during the week of Christmas and no training took place.

According to Graham, Boston was still making mistakes when sending out requests for missed inspections after Christmas. Boston alleges that Graham only let Boston observe her once or twice and that she never completed the missed list training and thus could not move on to train for other parts of the job. Boston also states that she was not given access to the U.S. Steel computer system until the day

she left and that Graham had denied her access although Boston had requested it. Boston did not report to Fields that Graham was not training her or denying her computer access. She also did not contact anyone responsible for labor relations at the plant to report that she was not being trained by Graham.

Boston was disqualified from the Ironworks position on January 10, 2012. Graham reported to Fields that Boston was missing procedures and failing to complete tasks, was unable to move past the missed list training to train for other parts of the job, and that Graham had to watch Boston to make sure she was completing tasks properly. Fields concluded that Boston could not fulfill the requirements of the Ironworks position. Boston again returned to layoff status.

Upon her disqualification from the Ironworks job, the Union filed a grievance on Boston's behalf asserting that Boston was not given sufficient time to learn the job. The grievance was denied.

### E.  April 2012 EEOC Retaliation Charge

On April 10, 2012, Boston filed a new EEOC charge asserting that she was laid off in retaliation for her earlier EEOC discrimination charge from October 2010. The April 2012 EEOC retaliation charge states, in relevant part:

> I was hired by the above referenced employer on January 5, 1991. My most recent position was Clerk earning $21.40/hour. My direct supervisor was Michelle Fields, Iron Works Manager, and her supervisor was Rick Veech, Plant Manager. I returned to work from being laid off on December 9, 2011. I filed EEOC charge

#846-2011-06647, which was closed on December 28, 2011. I was laid off in retaliation on January 10, 2012.

Boston also stated that the earliest date of discrimination was January 10, 2012 and the latest date of discrimination was January 10, 2012. She did not check the box indicating "Continuing Action." The April 2012 EEOC retaliation charge did not reference the May 2011 Pass Control disqualification.

Between January 10, 2012 and August 31, 2012, U.S. Steel posted five job vacancy notices for Clerical II positions. Boston did not bid on any of these jobs. Rather, she voluntarily retired on August 31, 2012, pursuant to the rules of the Steelworker's Pension Trust. By voluntarily retiring on August 31, Boston met the requirements under a 2008 Union agreement to receive a payment of $7,500. She would not have been eligible for the payment had she not retired by August 31. Boston claims that, had she not been laid off, she would have planned to work until she reached full retirement age around September 2015.

Boston received a Notice of Suit Rights in connection with the 2012 EEOC retaliation charge on April 19, 2013. She filed suit on June 3, 2013, alleging retaliation for her 2010 EEOC charge in violation of Title VII and the ADEA. She also asserted a common law claim for IIED. On November 4, 2013, a psychologist assessed Boston and diagnosed her with major depressive disorder and generalized anxiety disorder. Symptoms of these disorders reportedly appeared in 2010, around the time of the job disqualifications.

Following discovery, U.S. Steel filed a motion for summary judgment on both of Boston's claims. The district court initially denied U.S. Steel's motion. It held, however, that Boston could not pursue a claim of age or sex discrimination arising out of her 2010 employment in the BOF Department or a retaliation claim arising out of her May 2011 disqualification from Pass Control because these claims were time barred.

U.S. Steel then filed a motion to alter or amend the court's order denying the motion for summary judgment. The district court construed this as a motion for reconsideration and reconsidered the issues raised in the motion for summary judgment. On July 22, 2015, the district court granted U.S. Steel's motion for reconsideration as well as the motion for summary judgment as to both counts. Boston appeals.

## II. Discussion

We review de novo a district court's grant of a motion for summary judgment, construing facts and drawing inferences in the light most favorable to the non-moving party. *Lucero v. Nettle Creek Sch. Corp.*, 566 F.3d 720, 728 (7th Cir. 2009). Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

### A. Matters Properly Before This Court

We first address which matters are properly before this Court. Boston argues that she was retaliated against by U.S. Steel for filing an EEOC complaint, and that retaliation took the form of poor training and repeated disqualifications. She claims that U.S. Steel engaged in a pattern of conduct of re-

taliation, and that this pattern is encompassed by her disqualification from the Ironworks position.

U.S. Steel, however, contends that Boston impermissibly broadens her retaliation claim to include claims of alleged age or sex discrimination arising from the October 2010 BOF disqualification, as well as purported retaliation arising from the May 2011 Pass Control disqualification. U.S. Steel asserts that these claims were never properly before the district court and are not part of Boston's current retaliation claim.

In initially rejecting U.S. Steel's motion for summary judgment, the district court found that the alleged age or sex discrimination arising from the BOF disqualification was not actionable. The court noted that Boston's April 2012 EEOC complaint did not assert a claim for age or sex discrimination, and that she could not raise such claims for the first time in response to U.S. Steel's summary judgment motion. The district court also determined that these age or sex discrimination claims were time barred because Boston did not file a lawsuit against U.S. Steel based on the conduct alleged in the October 2010 EEOC discrimination charge within the prescribed ninety-day filing period.

Additionally, the district court found that any claim for retaliation arising from the Pass Control disqualification was time barred. The court noted that the Pass Control disqualification was a discrete act of termination and that Boston did not timely file a retaliation claim with the EEOC related to this action. Since the April 2012 retaliation charge only alleges retaliation arising from the Ironworks disqualification—and does not mention the Pass Control disqualification—the court concluded that any retaliation claim relating to the Pass Control disqualification was not actionable.

We agree with the district court on this threshold issue. Under Title VII and Illinois law, Boston was required to file a charge with the EEOC within 300 days of the alleged unlawful employment practice. 42 U.S.C. § 2000e-5(e)(1); *Filipovic v. K & R Exp. Sys., Inc.*, 176 F.3d 390, 396 (7th Cir. 1999). She filed neither a lawsuit against U.S. Steel pursuant to the October 2010 EEOC discrimination charge, nor any charge with respect to the Pass Control disqualification. Indeed, Boston's April 2012 retaliation charge indicates that she was complaining of a distinct act: Boston represented that the earliest date of discrimination was "1-10-2012" and did not mark the "Continuing Action" box. And "each discrete discriminatory act starts a new clock for filing charges alleging that act … –." *Beamon v. Marshall & Ilsley Trust Co.*, 411 F.3d 854, 860 (7th Cir. 2005) (citation and internal quotation marks omitted).

On appeal, Boston raises no counterargument to the finding that her two previous disqualifications are not actionable. Instead, she attempts to fold these additional disqualifications into her current retaliation claim. The BOF and Pass Control disqualifications are only relevant to the extent they are offered in support of Boston's sole actionable claim before this Court, namely the Ironworks disqualification. *See Davis v. Con-Way Transp. Cent. Express, Inc.*, 368 F.3d 776, 786 n.4 (7th Cir. 2004) (courts may look to time-barred acts as support for timely claims).

**B. Retaliation Claim**

To establish a prima facie case of retaliation, Boston attempts to meet her burden under the direct method of proof, the indirect method of proof, as well as the "cat's paw" theory of liability. We consider each argument in turn.

*1. Direct Method of Proof*

Boston may proceed under the direct method of proof to avoid summary judgment on a retaliation claim under Title VII or the ADEA. *Atanus v. Perry*, 520 F.3d 662, 671, 677 (7th Cir. 2008). Boston must show that: (1) she engaged in statutorily protected activity; (2) she suffered an adverse employment action; and (3) there was a causal connection between the two. *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006). She may prove retaliation by either direct or circumstantial evidence. *See id.* at 664–65. In other words, Boston must provide evidence from which a reasonable jury could conclude that the protected conduct—her filing of the 2010 EEOC charge—"was a 'substantial' or 'motivating' factor in the defendant's action." *Patton v. Indianapolis Pub. Sch. Bd.*, 276 F.3d 334, 340 (7th Cir. 2002) (citation and internal quotation marks omitted).

The evidence in the record suggests that Boston was treated unfairly during her training period at Ironworks. However, Boston does not meet her burden of showing that her 2010 EEOC charge was a substantial or motivating factor in her supervisor's termination decision. Indeed, Boston does not cite any evidence that demonstrates that her supervisor knew about the 2010 EEOC charge or decided to disqualify Boston based on that charge.

At the time of her discharge, Michelle Fields was Boston's supervisor. Boston testified that Fields never said anything to her about the 2010 EEOC charge. Boston also testified that no one told her that Fields had ever made any comment about the filing of an EEOC claim or lawsuit. According to Boston, co-worker and trainer Marcia Graham "supposedly went into [Fields's] office and told her everything [Graham] was doing with [Boston]." But Boston testified that she did "not know for a fact" that Fields knew that Graham was denying her access to a computer. Boston did testify that Graham made comments related to her EEOC claim, stating that "[s]he wasn't going to train me so that I could take her job on the next layoff." In any event, Boston "personally believe[d]" that "[m]anagement all knew that [she] filed an EEOC claim."

Even after drawing all reasonable inferences in Boston's favor, Boston does not demonstrate a causal connection between her protected action of filing an EEOC charge in 2010 and her disqualification by Fields. It is plausible that Fields relied on Graham's reports describing Boston's performance as mediocre; yet, Boston does not present any evidence that suggests Fields knew about the 2010 EEOC charge. The evidence therefore points to unfair treatment by Graham, rather than retaliatory termination.

*2. Indirect Method of Proof*

Likewise, Boston cannot succeed under the indirect method of proof. To prove retaliation under the indirect method, Boston must show that: (1) she engaged in statutorily protected activity; (2) she met her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) she was treated less favorably than similarly situated

employees who did not engage in statutorily protected activity. *Tomanovich*, 457 F.3d at 666. If Boston establishes a prima facie case, the burden of production shifts to U.S. Steel to articulate some nondiscriminatory reason for its employment action. *Id.* at 663. Then, if U.S. Steel meets its burden, the burden shifts back to Boston to demonstrate that U.S. Steel's reason is pretextual. *Id.*

We are unable to conclude based on the record that Boston was, in fact, meeting her employer's legitimate expectations or that she was treated less favorably than similarly situated employees. Boston claims that Graham provided superior training to at least one other Ironworks employee. Her sole support for this contention is that an individual hired after her must have received better training because that person remains in the job. Without more, this conclusory allegation cannot stand. *See Harper v. C.R. England, Inc.*, 687 F.3d 297, 306 (7th Cir. 2012) (explaining that a court's favor toward the non-moving party in considering a motion for summary judgment does not extend to inferences supported by only speculation or conjecture).

Even assuming arguendo that Boston has satisfied all of the criteria under the indirect method, she fails to offer proof that U.S. Steel's proffered nondiscriminatory basis for its January 10, 2012 disqualification of Boston from Ironworks was "mere pretext" for retaliation. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 798 (1973). Pretext requires "[p]roof that the defendant's explanation is unworthy of credence." *Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 642 (7th Cir. 2008) (alteration in original) (citation and internal quotation marks omitted).

Boston does not meet her burden to show that U.S. Steel lacked a good faith basis to disqualify her. *Tomanovich*, 457 F.3d at 663. The evidence in the record suggests that Boston actually was struggling with the job, since she acknowledged in a voicemail to Graham that she was trying to "figure this job out" and appreciated Graham's patience. There is also no evidence that Fields or the officials responsible for labor relations at the plant were aware that Boston was not being properly trained. Boston admitted she never told Fields that Graham was not training her or allowing her access to the computer.

As we noted in *Green v. National Steel Corporation, Midwest Division*, "[t]his Court has long championed an employer's right to make its own business decisions, even if they are wrong or bad. Therefore, regardless of whether it is correct in its beliefs, if an employer acted in good faith and with an honest belief, we will not second-guess its decisions." 197 F.3d 894, 899 (7th Cir. 1999). In the absence of evidence of pretext or bad faith, we will not second-guess U.S. Steel's decision to disqualify Boston.

### 3. *"Cat's Paw" Theory of Liability"*

Although a plaintiff must generally provide evidence that the decisionmaker acted for a prohibited reason to establish a prima facie case of retaliation, courts have imputed the retaliatory intent of a subordinate to an employer in situations where the subordinate exerts significant influence over the employment decision." *Long v. Teachers' Retirement Sys. of Illinois,* 585 F.3d 344, 351 (7th Cir. 2009). This theory of liability is known as the "cat's paw" doctrine. *Id.*

Boston relies on a recent U.S. Supreme Court case, *Staub v. Proctor Hospital*,[1] to support her cat's paw theory based on the alleged retaliatory actions of Graham, a co-worker who did not have the authority to disqualify Boston. 562 U.S. 411 (2011). In *Staub*, the Supreme Court observed that an "employer's authority to reward, punish, or dismiss is often allocated among multiple agents. The one who makes the ultimate decision does so on the basis of performance assessments by other supervisors." *Id.* at 420. Thus, an employer is liable where "one of its agents committed an action based on discriminatory animus that was intended to cause, and did in fact cause, an adverse employment decision." *Id.* at 421.

Boston claims that U.S. Steel wishes to insulate itself and Graham from any responsibility for "setting up [Boston] for failure in Iron Works and the obvious fact that [U.S. Steel] had notice of the EEOC filings." As in *Staub*, there is sufficient evidence to support a finding that Graham was, in effect, delegated some of Fields's disqualification authority since Fields relied on Graham's training reports. The question, therefore, is whether Graham acted with discriminatory animus that was intended to result in Boston's disqualification.

Boston argues that Graham "knew exactly what she was doing." According to Boston, Graham purposefully set her up to fail by withholding computer access, providing no more than thirteen days of training, and taking notes regarding Boston's lack of progress. Boston testified that Graham

---

[1] Although *Staub* concerns a different statute, the Uniformed Services Employment and Reemployment Rights Act, the Supreme Court's analysis of the cat's paw theory is equally relevant in this context.

made a direct comment to Boston regarding her filing of an EEOC complaint, stating: "I'm not going to train somebody so the next time that we … get laid off, I get laid off. I'm not training a union person for that. I don't care what you filed." Graham testified that [Graham] was non-union and salaried. Boston claims that Graham was angry that she had to train a union employee because, in 2008, Graham was laid off and replaced by a union employee.

Nevertheless, even after drawing all reasonable inferences in Boston's favor, Boston fails to meet her burden of proof to establish a basis for the application of cat's paw theory to her Title VII and ADEA retaliation claims. Notwithstanding Graham's stray remark, the evidence in the record as a whole is insufficient to show that Graham had a retaliatory motive or animus based on Boston's filing of the October 2010 EEOC discrimination charge. Boston is not entitled to inferences supported only by speculation or conjecture. *Harper*, 687 F.3d at 306.

The evidence Boston presents is hardly "significant probative evidence." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). For one, the statement "I don't care what you filed" is not an obvious reference to Boston's 2010 EEOC claim. It could, for instance, refer to a grievance filed by the Union. There is also no other evidence that Graham knew about the October 2010 EEOC charge. In any event, the circumstantial evidence is insufficient to support an inference of retaliatory animus. The timing of Graham's actions is not suspicious, as the training was provided more than fifteen months after Boston filed the 2010 EEOC charge. *See Long*, 585 F.3d at 350 ("Circumstantial evidence may include suspicious timing, ambiguous oral or written statements, or be-

havior toward or comments directed at other employees in the protected group.") And there is no proof that Graham trained or treated differently other employees who had not engaged in protected activity. *Id.*

In sum, Boston has not presented enough evidence to prevail under the direct method, indirect method, or cat's paw theory. The district court properly granted U.S. Steel's motion for summary judgment as to the retaliation claim.

## C. Intentional Infliction of Emotional Distress Claim

Boston next asserts a common law claim for IIED. She alleges that she suffered profound emotional distress due to poor training and repeated disqualifications by U.S. Steel.

To survive summary judgment on an IIED claim under Illinois law, a plaintiff must show that: (1) the defendant's conduct was extreme and outrageous; (2) the defendant intended that his conduct would cause severe emotional distress, or knew that there was at least a high probability that the conduct would inflict severe emotional distress; and (3) the conduct did in fact cause severe emotional distress. *Honaker v. Smith*, 256 F.3d 477, 490 (7th Cir. 2001) (citing *McGrath v. Fahey*, 533 N.E.2d 806, 809 (Ill. 1988)). IIED requires more than "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *McGrath*, 533 N.E.2d at 809 (citation and internal quotation marks omitted). Under Illinois law, one factor that influences the extreme and outrageous nature of the conduct is the degree of power or authority that the actor has over the plaintiff. *Id.* at 809–10.

Courts have found extreme and outrageous behavior in situations where an "employer clearly abuses the power it

holds over an employee in a manner far more severe than the typical disagreements or job-related stress caused by the average work environment." *Honaker*, 256 F.3d at 491. Boston notes that she has been diagnosed with major depressive disorder and generalized anxiety disorder, which allegedly stem from her treatment at U.S. Steel.

Upon reconsideration, the district court clarified that Boston's claims are based on Graham's alleged conduct and granted U.S. Steel summary judgment as to the IIED claim. Assuming arguendo that Boston established the elements of IIED with respect to Graham, the district court found that there was no evidence to warrant a finding that U.S. Steel was vicariously liable for Graham's conduct. According to the district court, "the evidence indicates that Graham's motivation for failing to train the plaintiff was personal. [Boston's] testimony indicates that Graham was motivated by a desire to retain her own position."

An employer may be vicariously liable for the tort of an employee if the tort is committed within the scope of the employment. *Bagent v. Blessing Care Corp.*, 862 N.E.2d 985, 991 (Ill. 2007). For conduct to be within the scope of employment it must: (1) be of the kind the employee is employed to perform; (2) occur substantially within the authorized time and space limits; and (3) be performed, at least in part, by a purpose to serve the master. *Id.* at 992. Where the motive for the employee's tort is personal and solely for the benefit of the employee, the employer is not subject to liability. *See Wright v. City of Danville*, 675 N.E.2d 110, 118 (Ill. 1996).

It is clear that Graham was performing training—a type of work she was employed to perform—and that this train-

ing took place during work hours within the office. The question is whether Graham carried out the allegedly botched training to serve her own personal interests or the business interests of U.S. Steel.

We agree with the district court that Graham's conduct was personally, rather than professionally, motivated. Boston herself testified that Graham's intention was to safeguard her own job. There is no evidence that Graham was serving a commercial purpose for the benefit of U.S. Steel by failing to adequately train Boston. In support of the fact that Graham was motivated by a purpose to serve the master, Boston merely states: "Graham was not on a lark. Graham testified that she was ordered by her boss to do the training as her boss would not be doing it."

But this is insufficient to meet the third prong for vicarious liability. Graham's failure to train a fellow employee does not, without further proof of U.S. Steel's interest in sabotaging Boston, constitute the pursuit of U.S. Steel's business interest. To the contrary, Graham's behavior undermines U.S. Steel's business interest in a well-trained, competent workforce.

In the absence of vicarious liability, Boston cannot succeed on her IIED claim. The district court properly granted U.S. Steel's motion for summary judgment as to this claim.

### III. Conclusion

For the foregoing reasons, we AFFIRM the judgment of the district court.