NONPRECEDENTIAL DISPOSITION

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued November 15, 2018
Decided November 28, 2018

**Before**

WILLIAM J. BAUER, *Circuit Judge*

MICHAEL S. KANNE, *Circuit Judge*

AMY J. ST. EVE, *Circuit Judge*

No. 18-2119

| | |
|---|---|
| GARRICK W. TRUELOVE, *Plaintiff-Appellant*, | Appeal from the United States District Court for the Northern District of Indiana, Fort Wayne Division. |
| *v.* | No. 17 cv 265 |
| NANCY A. BERRYHILL, Acting Commissioner of Social Security, *Defendant-Appellee*. | William C. Lee, *Judge*. |

**ORDER**

Garrick Truelove applied for supplemental security income, alleging disability based on numerous mental-health diagnoses and a right-elbow injury. An administrative law judge determined that, despite these impairments, Truelove could perform work at all exertional levels if the tasks were simple, routine, and repetitive. The district court upheld that decision. Because substantial evidence supports the ALJ's conclusions, we affirm the judgment.

## Background

Truelove was found disabled in August 2009 because of schizoaffective disorder and borderline intellectual functioning, but his benefits ended after a continuing disability review in December 2012 showed that he was able to work. (That decision is not at issue in this appeal.) Truelove filed a new application for supplemental security income in 2013, when he was 23 years old, alleging a disability onset date of October 30, 2007. He identified several ailments that prevented him from working: intermittent explosive personality disorder; schizoaffective disorder; cannabis abuse; mood disorder; borderline intellectual functioning; and a history of right-elbow pain and headaches. We focus on the impairments most relevant to Truelove's appeal: his mental-health conditions, causing mood swings and an inability to focus, and his elbow pain.

Truelove sought treatment for out-of-control anger in the fall of 2008. A therapist and psychiatrist team at Northeastern Center diagnosed Truelove with intermittent explosive disorder and a general mood disorder. He also attended therapy there for a brief period until his insurance coverage ended.

In connection with his first application for benefits and the continuation review, Truelove had two psychological consultative examinations with Dr. Robert Walsh—in August 2009 and October 2012. During both exams, Truelove discussed his depression, sleeplessness, and paranoia but denied suicidal or homicidal ideation. He reported difficulty concentrating and controlling his anger, but he noted that he was not taking any psychotropic medication or attending therapy. Dr. Walsh observed no memory or concentration deficits. In the 2012 exam, Truelove reported that he was doing "pretty good" and "used to get angry a lot but does not do that anymore."

In June 2014, agency psychological consultant Dr. Ann Lovko reviewed Truelove's mental-health records and opined that he could understand, remember, and complete unskilled tasks. Dr. Lovko also determined that he was able to engage with co-workers and supervisors on an ongoing basis and sufficiently manage work stresses. A second psychological consultant, Dr. Joelle J. Larsen, affirmed Dr. Lovko's opinion.

In 2015, Truelove's mood swings and anger sometimes led to thoughts of self-harm. He was hospitalized for several days in February after he was found by police on an overpass, under the influence of alcohol and marijuana, intending to jump. To the emergency-room staff, he reported worsening depression, blackouts, and "[p]oor

impulse control and frustration tolerance." He also recounted an episode when he fantasized about jumping out of a moving car.

About a month later, Truelove began outpatient psychotherapy at Northeastern Center. In monthly therapy sessions, he initially reported anger issues, sleeplessness, and depression, as well as suicidal and homicidal ideation. He was diagnosed with intermittent explosive disorder, schizoaffective disorder, nicotine dependence, cannabis abuse, and a general mood disorder. Doctors prescribed Seroquel to treat his mood disorder and depression and increased the dose to better manage his symptoms.

Over the nine months of Truelove's treatment, doctors at Northeastern Center noted improvements in his mood and concentration, despite medication gaps due to insurance issues. After only a month of increased Seroquel doses, Truelove reported that his mood and sleep improved. After three months of medication, he recounted that he was sleeping nine hours nightly and that his mind had stopped racing. Truelove reported struggling with his mood later on in September 2015 but noted these challenges occurred only if he had run out of medication. Even without consistent medication, Truelove denied suicidal or homicidal ideation. At Truelove's last appointment, in December 2015, he stated that his mood was "pretty good"; he had no concerns with sleep and denied any outbursts or violent thoughts. Though doctors recorded Truelove's below-average intelligence, they observed no deficits in his memory, attention, or concentration.

Truelove also developed a physical impairment: in January 2012, he fractured his right elbow after falling down cement steps. Orthopedic surgeon Dr. B. Matthew Hicks immediately performed surgery, and, about two weeks later, supervising physician Dr. Matthew J. Snyder removed the splint. Dr. Snyder also instructed Truelove to keep his arm in a protected position, limit it to a light range of motion, and avoid lifting. The doctor further advised Truelove to stop smoking cigarettes because it impaired his healing. At a follow-up appointment, Dr. Hicks reported that the fracture had healed, and he noted good alignment and position of Truelove's elbow. He ordered physical therapy, though Truelove did not attend.

At a consultative physical exam with agency physician Dr. H.M. Bacchus in August 2014, Truelove described having right-arm pain, even though his elbow reportedly had healed. Dr. Bacchus observed that Truelove had some reduced range of motion in his spine, shoulder, and wrist and "slight atrophy" in his hand and thumb muscles. But Dr. Bacchus also noted muscle strength and tone of 5/5 on his upper

extremities and normal grip strength and finger manipulation. That same month, nonexamining physician Dr. M. Brill reviewed Truelove's records and concluded that x-rays revealed a healed fracture, "good alignment," and intact grip strength in the right arm, albeit, "slight atrophy of hands and thumb muscles" and reduced range of motion in the right elbow. A second consulting physician, Dr. J.V. Corcoran, affirmed Dr. Brill's determination that Truelove did not have a severe physical impairment because he did not meet the durational requirement of 20 C.F.R. § 416.909 (requiring a continuous year of physical impairment).

Two years later, in February and March of 2016, Dr. Trina Chapman-Smith, a family-practice doctor, examined Truelove's elbow at two visits. She observed full strength in his right upper extremity and normal muscle tone in his right arm, but, for the first time, prescribed Naproxen (pain medication) for his elbow.

Truelove's claim for supplemental security income was denied initially and on reconsideration, so he proceeded to a hearing before an administrative law judge. Truelove testified in March 2016 about his challenges controlling his temper and using his right arm. About his temper, Truelove explained that he has outbursts several times a month, usually accompanied by blackouts when he cannot remember what happened. He recalled how he lost his temper at prior jobs as a farmhand and factory worker because he had difficulty remembering tasks and completing them quickly. At his last job, in April 2014, for example, Truelove was fired for "safety reasons" after he, in anger, held a factory grinder against his thumb.

Responding to questions about his elbow, Truelove said he sometimes has trouble lifting with his right arm. He testified that he experiences elbow pain every other day, but he takes medication, which reduces the pain level. Even with the pain, Truelove said he could lift about 25 pounds by holding an object with his left arm and balancing it on his right.

Truelove also testified about his daily activities. He recounted that he reads newspapers daily and understands what he is reading. He reported that he sometimes reads books and has a library card that he had recently used. Truelove also said that he cooks twice a week, mostly using the microwave and occasionally the oven. A couple of times a month, he grocery shops and does laundry. Truelove added that he sweeps or vacuums weekly without difficulty.

A vocational expert testified about Truelove's capacity to work. The ALJ asked the expert to consider a hypothetical claimant with Truelove's age, vocational background, and education, with no exertional limits; who had the mental capacity to perform "simple, routine, and repetitive tasks" not at production pace; and who could tolerate only occasional contact with coworkers and the public. Also, the claimant would require normal breaks and one excused absence per month. The expert testified that, with these limitations, the person could work as a dishwasher, a laundry worker, and a cleaner or janitor.

The ALJ concluded that Truelove was not disabled, applying the familiar five-step analysis. *See* 20 C.F.R. § 416.920(a). At step one, the ALJ determined that Truelove had not engaged in substantial gainful employment since his application date. At step two, the ALJ found that Truelove's intermittent explosive personality disorder, schizoaffective disorder, cannabis abuse, mood disorder, and borderline intellectual functioning were severe impairments, but his elbow fracture was non-severe because the evidence did not show it was disabling or lasted for 12 months. The ALJ assessed that none of the conditions met or equaled a listing for a presumptively disabling impairment under step three.

The ALJ then assigned a residual functional capacity consistent with that of the hypothetical claimant he described to the vocational expert. The ALJ attributed some of Truelove's symptoms to his medically determinable impairments, but he found that Truelove overstated the intensity, persistence, and limiting effects of the symptoms. His mental-health records did not show ongoing issues with anger, but instead demonstrated improvements with medication. Also, the record did not reveal any functional limits on his daily activities because of his psychological symptoms. Finally, at steps four and five, the ALJ determined that Truelove could not perform any past relevant work but could do the jobs that the vocational expert identified.

The Appeals Council denied Truelove's request for review, and the district court upheld the ALJ's decision.

## Analysis

We will uphold the Commissioner's decision if it is supported by substantial evidence. 42 U.S.C. § 405(g); *Walker v. Berryhill*, 900 F.3d 479, 482 (7th Cir. 2018). We will not examine the facts anew, reweigh the evidence, or substitute our judgment for the judgment of the ALJ. *See Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013).

Addressing first his arguments about his mental health, Truelove contends on appeal that the ALJ failed to properly incorporate into his RFC the limitations caused by his temper and blackouts, such as the "safety risks" that once caused him to be fired (and one time to head-butt a cow). He also argues that the ALJ overlooked his paranoia because the RFC allows him to be around coworkers and the general public up to a third of the time.

Truelove's arguments about his mental impairments fall short, primarily because he fails to identify or point to evidence of any functional limitations the ALJ should have imposed that would take proper account of his mental impairments. An ALJ may rely on medical evidence that the condition is treated and controlled by medication. *See Prochaska v. Barnhart*, 454 F.3d 731, 737 (7th Cir. 2006). The ALJ's decision rests on substantial evidence in the record that Truelove has sufficiently managed his psychological symptoms with medication, and Truelove does not counter these findings with other evidence. He reported at his last therapy session that his mood was "pretty good," and he denied any outbursts or violent thoughts.

As for the "blackouts," the ALJ cited Truelove's mental-health records from the Northeastern Center—in which no problems with memory or concentration were reported—as well as Truelove's own statements about improvements in his mood with medication. Even so, the ALJ gave Truelove more restrictive functional limits than the agency psychologists recommended by including in the RFC the need for normal breaks to address Truelove's testimony that he "spaces out" at work. Regarding paranoia, Truelove does not point to any medical evidence that the ALJ failed to consider. Indeed, there is no evidence about any effects of paranoia; there simply are references to his diagnosis of schizoaffective disorder and his vague testimony that he feels paranoid in public. The ALJ noted that the mental-health records do not show ongoing issues with anger or paranoia.

Finally, the ALJ did not fail to address the "safety risks," such as when Truelove harmed himself at work out of frustration. The ALJ excluded production-pace work from the RFC to account for Truelove's anger when he cannot keep up with tasks.

Truelove further contends that the ALJ should have placed more pronounced limitations on his concentration, persistence, and pace. To the extent that this is a separate argument, Truelove fails to develop the point. Moreover, he neglected to raise it in the district court, and therefore waives the argument. *See Puffer v. Allstate Ins. Co.*,

675 F.3d 709, 718 (7th Cir. 2012). Truelove also generally argues that his low IQ required the ALJ to impose additional, unspecified, work-related limitations. But this argument appears in a single-sentence footnote, without record support, and so is also waived. *Long v. Teachers' Ret. Sys. of Ill.*, 585 F.3d 344, 349 (7th Cir. 2009). In any case, the ALJ highlighted Truelove's "adaptive functioning" in light of his intellectual deficits and did not find additional restrictions necessary.

Next, Truelove challenges the ALJ's analysis of his physical impairment, his right-arm pain. He first says that the ALJ erred by not including right-arm limitations in the RFC to account for his reduced range of motion in his elbow and atrophy in his hand. Also, he says, the ALJ improperly discredited the severity of these symptoms because of his failure to attend physical therapy for his elbow, his chronic smoking, and his daily activities. We note, however, that the ALJ did not rely upon, or even mention, Truelove's smoking or his failure to do physical therapy in connection with the credibility determination, so we do not address that portion of his argument further.

The medical reports of Truelove's elbow injury are substantial evidence supporting the ALJ's decision not to include right-arm limitations in the RFC. Records from Dr. Hicks, the orthopedic surgeon, show that his 2012 elbow fracture was fully healed, and the consultative exam by Dr. Bacchus in 2014 revealed no functional limitations beyond some reduced range of motion. The two reviewing physicians, likewise, did not see evidence in the medical records of substantial impairment, let alone one that could meet the 12-month durational requirement in § 416.909. Even Truelove does not say what work-related limitations, if any, the healed fracture causes; indeed, he testified he manages the pain with medication. The ALJ partially credited Truelove's subjective testimony that he had trouble lifting and moving his elbow but found that he overstated its limiting effects, highlighting Dr. Chapman-Smith's notes in early 2016 that recorded full strength and normal range of motion.

Finally, Truelove contends that the ALJ's adverse credibility determination improperly rests on his daily activities, but he did not present that argument to the district court, and it is therefore waived. *See Puffer*, 675 F.3d at 718. Regardless, the ALJ's credibility determination properly noted that Truelove performed various household tasks and "heavy to very heavy" work in short-term jobs as a factory worker and farmhand in the years after his fracture, which did not support a disabling elbow impairment. *See Pepper*, 712 F.3d at 368–69.

The district court's judgment upholding the ALJ's decision is AFFIRMED.